UNITED STATES of America

v.

Harold E. MILLS, Appellant.

No. 22444.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Feb. 26, 1971.

Decided May 10, 1972.

Mr. Peter F. Rousselot, Washington, D. C. (appointed by this Court), with whom Mr. Richard B. Ruge, Washington, D. C., was on the brief, for appellant.

Mr. Robert C. Crimmins, Asst. U. S. Atty., for appellee. Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and Roger E. Zuckerman, Asst. U. S. Atty., were on the brief, for appellee.

ON REHEARING EN BANC

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges, sitting *en banc*.

LEVENTHAL, Circuit Judge:

Appellant was convicted by a jury upon a three-count indictment charging violations of the Federal narcotics laws. The central question is the admissibility in evidence of narcotics found in appellant's possession on a search of his pockets at the police station, where he was brought following an arrest for the petty offense of driving with a learner's permit while unaccompanied by a licensed driver.[1] The appeal was originally heard by a division of this court, which affirmed the conviction, one judge dissenting, as to counts one and two of the indictment. The denial of appellant's motion to suppress the narcotics, made at pre-trial hearing, and renewed at trial, was sustained on the ground that the inspection of the contents of appellant's pockets was valid because he was to be detained in stationhouse confinement. Appellant had the right to post $50 collateral for that petty offense, and had he been accorded that opportunity he would, with $171 in cash on him, have been permitted to leave the stationhouse forthwith, without any search of his person. We hold that the stationhouse inspection of the contents of his pockets

---

1. We assume, for present purposes, that the Government is correct in saying that the punishment—a fine of not more than $300 or imprisonment for not more than 90 days—prescribed by 40 D.C.Code § 301 (a) (2), (d) for the offense of operating a motor vehicle "without first having obtained an operator's permit or a learner's permit," applies to someone who has obtained a learner's permit but is not accompanied by a licensed driver as required.

was an unreasonable search, in violation of the guarantees of the Fourth Amendment, and that the evidence found as a result of this search is inadmissible.

## I. FACTUAL BACKGROUND

On December 29, 1967, Patrolman Willie C. Ivery, Jr., of the Metropolitan Police, was on patrol in the neighborhood of Sixth and H Streets, N.E. At about 4:30 a. m. he observed an auto, driven by appellant, approaching him at an excessive rate of speed. He flagged the car down, walked over to it, and asked appellant, who was alone in the car, for his driver's permit and the automobile registration. Appellant produced only a District of Columbia learner's permit and did not have the registration. The officer told appellant that it was illegal to operate an automobile with a learner's permit unless a licensed operator was with him. Appellant told him that he had just dropped off the car's owner at a nearby restaurant. The officer then placed appellant under arrest for driving without a proper permit. Officer Ivery patted appellant down and found no weapons. He called for a scout car, which arrived shortly thereafter. The officers and appellant then drove to the nearby restaurant and there Craig Tatum, the owner of the car and a licensed operator, verified appellant's account. Officer Ivery told Mr. Tatum that he would be cited for permitting an unlicensed driver to operate his car and asked Tatum to accompany him to the precinct. Tatum agreed, and Ivery went with him, following the other officers, who had charge of appellant, to the stationhouse.

The difference in Officer Ivery's handling of appellant by arrest, as distinguished from the citation procedure used with Mr. Tatum, was not due to any apprehension of danger from appellant, but was based on the officer's understanding that appellant's offense, as contrasted with Tatum's, required an arrest procedure. Officer Ivery testified at trial that his "normal procedure" was to proceed by citation for petty offenses unless the person "disrespects me or something." Tatum was asked to go to the station to pick up his articles; asked whether Mr. Mills had offended him, Ivery replied "No." The trial transcript reveals that Mills stopped promptly on hearing the whistle,[2] the officer quickly verified that Mills had had Tatum's permission to drive the car, nothing turned up in the frisk for weapons conducted in the street, and Mr. Mills did not resist arrest in any way but was "very cooperative." The reason Officer Ivery gave for arresting Mills, instead of proceeding by citation, was: "This is a different type of offense. . . . This type of offense always constitutes an arrest, having no D.C. permit." It appears that police instructions had not caught up with a recent change in the law[3] which made the arrest for this offense a matter of discretion. However, we assume that the arrest of Mills was valid.

As to events following the arrival of Mills at the police station, the police say that Mills was taken into the stationhouse through a side door, detained briefly in a small room, and was then delivered into the custody of Officer Ivery, who brought him to the booking desk. Ivery testified that Mills was then ordered to remove everything from his pockets, the standard procedure for persons to be held in stationhouse detention. Mills emptied his pockets—which contained more than $170 in cash—but

2. The significance of this is borne out by Preliminary Hearing Tr. 8; "Usually when a policeman is walking the motorist don't stop. This [blowing the whistle] is more or less a test to see if he would stop."

3. 23 D.C.Code § 610(b) (Supp. I, 1968), *amending* 23 D.C.Code § 610 (1967).

This section, as amended, was subsequently repealed as part of the 1970 recodification of the Criminal Procedure Code. Act of July 29, 1970, Pub.L. No. 91–358, § 210(b) (6), 84 Stat. 604. The relevant statute now governing the applicable arrest procedures is 23 D.C. Code 581(a) (1) (B) (Supp. V, 1972).

was reluctant to expose whatever was in the left pocket of his jacket. Mills had stuck his hand in that pocket, according to the police; when Ivery assisted Mills in removing the hand, Mills was seen to be holding a small black change purse, the contents of which were later identified as 22 capsules of heroin and 33 capsules of cocaine.

While we accept the foregoing account for purposes of this case, we take note that Mills claims that in the small side. room, or back room, he was searched thoroughly, stripped of his clothing, that it was during this search that the narcotics were found, and that he was not brought to the booking desk until after the narcotics had been found during the strip-search in the small room.

## II. THE UNREASONABLENESS OF THE SEARCH

*Applicable Principle*

■ In deciding whether the search was valid, our starting point, as noted above, is that the arrest of Mills for driving without a proper permit was valid. We do not rely upon the doctrine that when an arrest on a traffic charge is used as a pretext to justify a search for evidence of other crimes, the search is invalid.[4] However, the bare fact that a person is validly arrested does not mean that he is subject to any and all searches that the arresting officer may wish to conduct. "[T]he mere fact of a lawful arrest does not end our inquiry." Schmerber v. California, 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966). Under the Fourth Amendment, the validity of searches and seizures turns upon their reasonableness, and even when there is a valid arrest the search must be reasonably incident to the arrest.

■■ In most situations, the reasonableness of the search of an arrested man is clear enough, for it is reasonable for an arresting officer "to search the person arrested in order to remove any

weapons that the latter might seek to use in order to resist arrest or effect his escape" and "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). Those justifications have no application for the case before us— even assuming that the scout car officers did not strip-search Mills in the side room, and that we take Officer Ivery's account that the emptying of pockets followed on the booking for driving alone with a learner's permit. There was no question of a stationhouse search for weapons or for evidence concerning the offense of driving without a proper permit; appellant was frisked at the time of the arrest, with no arms found, and the offense was proved completely at the time of the arrest. The validity of the search of Mills at the stationhouse must stand or fall on the premise that it was a predetention inventory, undertaken to hold and account for valuable or potentially dangerous personal property—such as rings, belts, watches or jewelry—during the detention of the person arrested. This is the theory underlying Officer Ivery's trial testimony and it is defended by Government counsel.

We do not here consider the proper scope of a search that is supported by the premise of forthcoming confinement. In this case, no such justifying premise is available to validate the search of defendant Mills described by Officer Ivery. Having been arrested for a petty offense, Mills should have been informed of his opportunity, prescribed for that offense, to post $50 collateral and leave the precinct station. Instead, the police officer who conducted the booking proceeded forthwith to require Mills to empty his pockets. We think that was an unreasonable search.

*The En Banc Remand Order*

■ The pertinent facts appear in the trial transcript and in the transcript of

4. Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968); Taglavore v.

United States, 291 F.2d 262 (9th Cir. 1961).

remand proceedings in the District Court, which this court, en banc, ordered after hearing oral argument. Four judges dissented from that remand, being of the view that the appeal should be decided on the record already made. It is appropriate to identify and explain the basis of that remand order. The majority of the court is of the view that the remand was appropriate in light of the statute authorizing an appellate court to "require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. On the disposition by the division drawn for the case, there were three opinions: Judge Robb was of the view that it was reasonable for the police to take charge of the contents of appellant's pockets since he was about to be placed in a cell. Judge Fahy concurred, reserving his position if evidence other than contraband were seized. Judge Robinson dissented, being of the view that a rule authorizing an extensive booking search in case of arrest would provide incentive to make arrests, for the purpose of search, for offenses normally handled without arrest, and that an accommodation of all proper interests could be accomplished by permitting a "booking" search of an opaque container (here, the change purse) only if there was some reason to believe this was needed to avoid danger to the police.

On rehearing, the court en banc was required to grapple with the problem of police "inventory searches"—when, why and to what extent were they needed and reasonable. It developed, on questioning at oral argument, that just as not all offenses lead to arrests, not all arrests lead to confinement. Counsel were asked to file supplementary memoranda concerning this possibility, and such memoranda, duly filed, set forth the outlines of the system in this jurisdiction under which a number of minor offenses—this one included—are of a collateral type, so that the offender may post collateral and depart without confinement. The court considered it in the interest of justice that this information be amplified in remand proceedings: to identify whether any police officer present had the function to inform the defendant that he could post collateral for his offense; whether this information was given defendant; and if so why defendant failed to post collateral.[5]

This supplementary information was considered of possible materiality to a sound decision concerning the possible justification of so-called inventory searches. The questions posed with respect to defendant—who was arrested for a $50 collateral offense, and was detained although he had $171 in his pocket—were not only pertinent to justice in his case, but spotlighted questions of broader import, as will appear.

The foregoing established, in our view, a sound predicate for the court's exercise of its remand authority. Appellate courts are called upon for two functions—to accord justice in the particular case; and to settle underlying principles of law. When cases raise constitutional or other basic questions, it is often a responsible exercise of the function to remand for a full record developed on hearing, rather than decide the matter on the record as made in the trial court. United States v. Robinson, 145 U.S.App.D.C. 46, 447 F.2d 1215 (*en banc*, 1971).

*Pertinent Facts*

A stipulation was entered into between the parties, prior to the remand hearing, as to the collateral system, and particularly police recognition that, if the offense is one for which collateral may be placed, offenders must be advised of their opportunity to post collateral, and

5. "It is . . . FURTHER ORDERED by the Court *en banc* that the District Court take evidence and make findings as to (1) Whether at the time of the defendant's arrest it was the function of the stationhouse clerk, or some other police officer, under either regulation, written or oral instruction, or general practice, to advise the defendant that his was an offense for which collateral could be posted; (2) Whether this information was given to defendant; and (3) If so, why defendant failed to post collateral." Order of May 27, 1971.

are not subject to police inventory searches unless they are unable or refuse to post collateral. The stipulation reads as follows:

No. 1, the Government and defense stipulate that those who are brought to a police station for an offense for which collateral may be placed are advised of their privilege of posting collateral and are not searched at the station house.

Only those who are arrested for crimes for which there is no collateral and those unable to post collateral or refuse to do so are searched pursuant to Chapter 4, Section 3 of the Police Regulations prior to being placed in confinement.

Stipulation No. 2, no D.C. Permit, the offense Mr. Mills the defendant was charged with, was at the time of his arrest a collateral offense for which collateral was $50.00.

Stipulation No. 3, the Government and defendant further stipulate that as a matter of police practice, both the arresting and booking officer advise those arrested who are eligible for collateral of the collateral system, but since these officers are generally in each other's presence at the booking, one or the other of the officers will advise the person arrested.

In addition, the District Judge found that Mills had $171 in cash on his person at the time of his arrest.

The District Court did not explicitly identify how it came about that Mills, with $171 in his pocket, failed to post collateral of $50 for the minor offense, and was processed and inventoried for stationhouse confinement.

Under Mills' account there is no mystery: He testified that at the time of the booking his possession of narcotics had been discovered in the strip-search in the side room; and he further testified as to his understanding that he was booked for this narcotic offense. Narcotics possession is concededly an offense for which collateral is unavailable.

The Government's justification is predicated upon the possibility that appellant was booked for the minor offense, was notified of the opportunity to post collateral, and declined to do so.[6]

We are convinced, as the realistic conclusion from this record, that Mills was not given opportunity to avoid confinement by posting $50 collateral, and that he did not refuse to do so. Mills had $171 in his pocket—evidence of highest caliber in support of that conclusion. The practice, as stipulated, was for both arresting officer and booking officer, or one in the presence of the other, to advise those eligible for collateral of the collateral system. Officer Ivery was both arresting officer and booking officer for he took charge of the writing up of Mills' offense.[7] His actions and testimony make clear the difference in his

---

6. The Government relies on this finding of the District Court:
7. Whether defendant was given an opportunity to post collateral remains *unclear* due to:
A. The inability of any of the stationhouse clerks or transporting officers on duty the night of the defendant's arrest to recall the event that transpired [REM. 4–5],
B. The failure of the government, despite efforts made [REM. 4–71] to locate two other officers who were in the stationhouse that night [REM. 5],
C. The lack of any recollection as to this matter on the part of Mr. Craig Tatum who was arrested in conjunction with Mr. Mills that night [REM. 5], and

D. The death in the line of duty of the arresting officer, Willie C. Ivery, shortly after the trial in this case [REM. 4]. Officer Ivery testified at the trial in this case that he did not ask Mills whether or not he had sufficient money to post collateral for the offense of no D.C. operator's permit [TRIAL 47; REM. 7–8].

7. As stated in Judge Robb's opinion for the division: "At the stationhouse, as part of the booking prcedure, Officer Ivery directed Mills to produce the contents of his pockets." Officer Ivery carried out, in this instance, the function of the station clerk to record arrests. The station clerk is also responsible for money received as collateral and property taken from pris-

approach with regard to Tatum, who was to be given opportunity to post collateral and depart, and Mills, who was to be detained.[8] While Officer Ivery's intervening death precluded his testifying at the remand hearing, his testimony at the pre-trial hearing (see note 8) establishes that he made the writing up of Tatum's case the "first order of business" in order "not to detain him any longer since [Tatum's] was a type of case where he could pay the ticket then or take a ticket and pay in five days, ten days, whichever he chose to do." This first testimony points up that Officer Ivery handled Tatum with an approach appropriate for a "collateral" type offense, and that this was different from his approach for Mills. At trial, Officer Ivery testified that when he arrested Mills he did not ask whether Mills had sufficient money to post collateral for the offense (Tr. 47), and elaborated that Mills' violation was one that always required an arrest, unlike Tatum's, which permitted citation (Tr. 51). At the stationhouse, he made clear, Tatum's violation only required that I "had to write a citation. I did not say I booked Mr. Tatum or proceeded or intended to book Mr. Tatum." (Tr. 52). In view of Officer Ivery's acknowledgement that he gave priority to the citation for Mr. Tatum because he had the choice of posting collateral, and particularly in view of the ample funds in Mr. Mills' possession, the foregoing record amply establishes that Mr. Mills was not given an opportunity to post collateral.

In addition, we note that there is not a glimmer of a suggestion in Officer Ivery's testimony—in either direct or cross-examination, either at the pre-trial hearing or at trial—that the booking of Mr. Mills, and conduct of an inventory search incident thereto, was accompanied by a reference, avowedly not accorded on the street, to any opportunity to post collateral. It was as part of the process of booking Mills that Ivery conducted the thorough search prescribed for persons "being placed in confinement." [9]

At the trial, Officer Ivery related on direct examination that he walked through the front entrance to the rear of the stationhouse where he took custody of appellant, who had just been brought in the side entrance by the transporting officers, and brought appellant to the front desk. He continued (Trial Tr. 30):

A. At this time I proceeded to write two violations for having no D.C. permit and also Mr. Tatum permitting an unlicensed operator.

Q. Did there ever come a time when you made a search?

A. Yes, I did.

Q. Will you tell us, please, if you will—

A. After completing the violations, normally we take the property from the prisoners that they may effect an

---

oners. Manual of the Police Department (hereafter Police Manual), issued in 1948 as regulations approved by the Commissioners of the District of Columbia, ch. XVIII, secs. 3, 11.

8. See Transcript, Pre-Trial Hearing, 37–8, where Ivery confirmed his testimony at the preliminary hearing:

Q. Now, after Mr. Mills and you and the other gentleman [Tatum] got to the station, what did you do then?

A. Well, I proceeded to write the gentleman a ticket. Not to detain him any longer since it [Tatum's] was a type of case where he could pay the ticket then or take a ticket and pay in five days, 10 days, whichever he chose to do. This first order of business was to write the violation for him. Remember that testimony?

A. This was, as soon as I possibly could. He wasn't detained very long before I wrote the ticket for the gentleman [Tatum].

9. See Police Manual, ch. VI, sec. 3: "Before being placed in confinement, prisoners shall be thoroughly searched and money, jewelry, other articles of apparent material value, billfolds and contents, ties, belts, suspenders, and all weapons and other articles with which they might injure themselves or effect an escape, shall be taken from them."

escape or anything that he may have access to that would harm himself or some other person. This was taken away at the desk where he was standing, and usually I ask the prisoner if he will do this himself, and if they cooperate, then you don't have to do it.

Q. What did he do in this case?

A. Well, he cooperated and took everything out of his pockets and laid it on the counter and he was deprived use of it. And later I noticed his reluctance to pull his left hand out of his pocket.

Q. What did you do upon noticing that?

A. Then I asked him to take it out and he was still reluctant, so I assisted. So this is when this purse fell out of his pocket, black change purse.

He reiterated and amplified the procedure that had been followed in his answers on cross-examination (Trial Tr. 53–57):

"A. First, I accepted the prisoner [Mills] [from the officers in the scout car] and brought him up to the counter and proceeded to write the citations, both for Mr. Mills and also for Mr. Tatum.

Q. You accepted the prisoner?

A. Yes.

Q. Then you walked the prisoner up to the booking desk?

A. Up to the area where we take the property. You could call it the booking desk. It is associated with the clerical positions in the area where the clerks work in the precinct.

\*　\*　\*　\*　\*　\*

Q. Then after writing a citation for Mr. Tatum you searched Mills; is that correct?

A. Well, after completing the citation for Mr. Mills, then I advised him to take everything out of his pockets, and the normal procedure is to lay it on the counter.

\*　\*　\*　\*　\*　\*

Q. Did you personally conduct the search of Mr. Mills?

A. Yes, I did.

\*　\*　\*　\*　\*　\*

Q. Now the search at the station house was what you would also call patting down the defendant; isn't that correct?

A. No, this is a thorough search.

\*　\*　\*　\*　\*　\*

Q. You found the narcotics after patting him down, searching for a weapon more or less at the station house, but you didn't find them on the street after patting him down.

A. The station house was a more thorough search as I stated earlier. This is when you take the belt, jewelry, watches, rings, things of this nature. It is a complete search."

We have developed why this record leads us to a clear conviction that Mills was not given an opportunity to post collateral. We do not base that conclusion on Mill's testimony, though we think the conclusion is entirely consistent with his testimony, for reasons explained in the footnote,[10] indeed is fortified by his testimony.

10. At the remand hearing, Mills testified he knew about collateral. See Tr. 11–12:

Q: Did you know what collateral was?
A: Yes.
Q: How did you know what collateral was?
A: Well, when you are driving a car, like you usually know the basic rules and regulations, you know.
Q: So you knew before you went to the station house that night that you could

have posted collateral for no D.C. permit?
A: Yes, I knew it.
Q: When you got to the station house and you found out that the police officers were going to detain you, did you ask them about the collateral system?
A: No, I did not.
Q: Why not?
A: They said they were going to detain me.

Furthermore, it is not enough, as the District Judge seems to have supposed, for the Government to point to a bare possibility that Mills was given an opportunity to post collateral. As will be explained in the next section of the opinion, the police had a duty to advise defendant of his opportunity to post collateral for this minor offense, and at this suppression hearing the Government had the burden of showing that such opportunity was given.

### Duty of Booking Officer To Advise Of Collateral Opportunity For Minor Offenses

 When circumstances justify stationhouse detention, there is reason for some search of the person involved—putting aside, for present purposes, any attempt to grapple with the difficult questions of permissible occasion and extent of "inventory" searches. But it would be entirely unreasonable to hold that policemen have discretion to detain and therefore thoroughly search petty offenders like Mills, who may avoid stationhouse detention altogether by posting collateral. A huge proportion of the public is guilty of some sort of petty infraction almost every day—jaywalking, exceeding the 25-mph limit, using high beams, parking in a loading zone, among many others. Informing a person arrested for such a minor offense of his option to post collateral, and giving him an opportunity to exercise that option, is a necessary precondition to a thorough and complete search that is conducted only as an incident to the needs of stationhouse detention.[11]

Our conclusions concerning the obligation of police to give "notice and opportunity" to petty offenders of their option to post collateral are fortified by the fact that the stationhouse clerks who have the function of booking offenders (*supra* note 6) are also serving as acting clerks of court—formerly Court of General Sessions, now the Superior Court—during the hours when court is not in session. See 23 D.C.Code §§ 610, 1110.

If for some reason the police officer concludes that interests of the community require additional protection, established regulations and orders make clear that he cannot act solely on his own discretion. The Police Manual regulations provide ch. VIII, § 9:

> The bond and collateral lists established by the Municipal Court for the

When the Government pursued the matter in detail to clear it up, it developed that Mills knew about collateral from previous incidents involving friends of his, where persons were given tickets on the street and permitted to post collateral at the precinct station. He also knew that Tatum had been allowed to post collateral and leave, because he loaned Tatum the necessary funds.

As already noted, Mills testified that he had been searched before being booked, and believed he was being booked for narcotics.

Mills' closing testimony on remand reenforces that he was not told of the opportunity to post collateral.

Q: When you got brought in on this charge and you went to a back room and you didn't go to the booking desk, why didn't you say something about collateral?

A: They didn't ask me anything about collateral.

Q: I know they didn't ask you. I am asking you: Why didn't you ask them? Did you want to be strip searched?

A: Like I told you at first, I am at a precinct. I don't ask questions, you know. I answer them.

11. In saying this is a necessary condition we do not say it is automatically a sufficient condition for a stationhouse search of pockets.

When a petty offense is of a collateral nature, a question arises whether an offender without means (a) can be detained on account of such violation—or whether such detention enforces an invidious discrimination on the basis of wealth; and (b) assuming he can be detained, whether a person arrested for a petty offense can be subject to a thorough search, or whether a less extreme intrusion on privacy does not mark the limits of reasonableness, as by giving him an opportunity, like that accorded someone given a bathhouse locker for temporary use, to "check" his belongings in a sealed envelope, perhaps upon executing a waiver releasing the officer of any responsibility.

District of Columbia shall be strictly complied with by members of the Force and no member shall accept or require a greater or lesser collateral than that specified in these lists.

The order signed by Chief Judge Smith of the Court of General Sessions, effective April 19, 1965, provides: [12]

Whenever it shall appear to the police officer commanding a precinct, division or squad of the Police Department that, by reason of the special facts or circumstances of a case in which an arrest has been made by an officer under his command, the collateral set herein is inadequate to protect the interests of the community in the premises, he shall communicate by telephone or otherwise with a judge of [The Court of General Sessions] advising the judge of the facts and circumstances of the case for the purpose of having the judge set bond or collateral in a higher amount. * * *

When a person is charged with a collateral-type petty offense, under which he rightfully has the opportunity to post collateral and avoid further detention, and there is no probable cause to believe he committed a more serious crime, the police may not engage in an inventory search of the offender, or an equivalent direction that he empty his pockets, and seek to support it on the ground of holding him in further confinement, unless at a minimum he was timely notified of his opportunity to post collateral (and thus avoid further detention) and refused or was unable to do so. Assuming that, in the context of a motion to suppress, the presumption of regularity puts a burden on the defendant to come forward with some evidence that such an opportunity was not afforded, that burden is met, and the presumption is overcome, when, as here, defendant establishes that he had on his person money enough to post the necessary collateral. That put it to the Government, if it were to sustain the search as incident to stationhouse confinement,

to make a showing that it accorded the opportunity to post collateral. There was no such showing by the Government. Indeed, as already stated, the total record—at trial and on remand—convinces us that no such opportunity was accorded.

## Other Precedents

While we know of no direct Federal circuit precedent, the views stated herein are in accord with opinions of other courts.

In California v. Mercurio, 10 Cal.App. 3d 426, 88 Cal.Rptr. 750 (1970), a man arrested when he walked backward across a street against a "don't walk" signal was taken to the police station, and was unable to produce satisfactory identification. He was required to undress, and a police search of his clothing disclosed a vial of marijuana. The court took account of the legislature's intent to allow a person arrested for this offense to post bail "to avoid the indignity of jailing." 10 Cal.App.3d at 431, 88 Cal.Rptr. at 752. Although the arrest of appellant was lawful, "the failure of the officers to take him before . . . a person accepting bail in accordance with schedule, deprived the subsequent jailhouse search of validity." 10 Cal.App. 3d at 432, 88 Cal.Rptr. at 753.

In Carpio v. Superior Court, County of Santa Barbara, 19 Cal.App.3d 790, 97 Cal.Rptr. 186 (1971), the offender was, *inter alia,* charged with speeding and driving on an expired temporary permit. A jailhouse search uncovered marijuana. The court, noting that the offenses charged would have entitled appellant to release on bail, held the contraband was unreasonably and illegally seized, stating:

It is admitted that there was no reason to assume that petitioner would not have been able to post the required bail bond had he been given the opportunity to do so.

19 Cal.App.3d at 793, 97 Cal.Rptr. at 188.

12. Appellee's supplemental memorandum, March 11, 1971, Appendix C.

The Colorado Supreme Court in People v. Overlee, 483 P.2d 222 (Colo.Sup. Ct. En Banc 1971) held that the discovery of contraband during an inventory search was unlawful since the offender was eligible for release after his arrest for traffic violations upon posting $25 bond and signing a written promise to appear in court to answer the charges. The arresting officer, through an apparently good-faith mistake, required a $75 bond. "[I]f the officer had required only $25 bond—as he should have done—the defendant would have posted it and would have been immediately released; and there would have been no search." 483 P.2d at 223. *Accord,* People v. Greenwood, 484 P.2d 1217 (Colo.Sup.Ct. En Banc, 1971).

*Conclusion*

We are not to be understood as inferring bad faith on the part of Officer Ivery. But even the best of good faith cannot justify an unconstitutional search. The officer's order to appellant to empty his pockets was a stationhouse search which required a premise of stationhouse detention for its justification. When, as here, the arrest is for a minor offense for which the police must give defendant opportunity to post collateral, the defendant was detained notwithstanding he had funds sufficient to post collateral, and there is no showing that defendant was given opportunity to post collateral, any detention-based inventory justification is negatived, and the search must be held invalid. The evidence found as a result of that search was inadmissible.

Reversed and remanded.[13]

ROBB, Circuit Judge, dissenting:

I dissent. Almost four years after this case was tried in the district court the majority has retried it on issues that were raised for the first time by this court. Moreover, the majority has resolved those issues by brushing aside findings of the district court and resorting to speculation and surmise. I cannot agree to such procedures.

The appellant Mills was arrested and searched December 29, 1967. His motion to suppress was heard and overruled May 17, 1968 and he was tried and convicted on July 18 and 22, 1968. On his appeal before a division of this court he contended, as he had in the district court, that the search at the stationhouse was invalid because his arrest was a pretext adopted by the police to justify their search for narcotics. He did not claim that the police acted improperly in placing him in a cell; on the contrary his counsel accepted the premise that "there was a legitimate governmental interest, prior to Appellant's actual incarceration, in a more thorough search of him to insure that the jail remained free of weapons to guard against Appellant's escape, and to insure Appellant's own safety—the very reasons mentioned by Officer Ivery." (Appellant's Brief, pps. 26, 27). On the premise that the appellant's incarceration was proper, a majority of the division rejected his claim that his arrest was a pretext, and held that the stationhouse search was valid.

The opinion of the division was vacated and on February 26, 1971 the case was reargued before the court sitting *en banc.* During the argument a new theory of the case was advanced from the bench, namely, that unless Mills was told that he might post collateral his incarceration and the preceding search were improper. Thereafter, on May 27, 1971, with four judges dissenting, the court remanded the case to the district court with directions that it "take evidence and make findings as to (1) Whether at the time of the defendant's arrest it was the function of the stationhouse clerk or some other police officer, under either regulation, written or oral instruction, or general practice, to advise the defendant that his was an offense for which collateral could be post-

---

13. We approve the ruling of the division that appellant's conviction on the third count, involving cocaine, must be reversed on the authority of Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

ed; (2) Whether this information was given to defendant; and (3) If so, why defendant failed to post collateral."

Pursuant to the order of remand the district court took evidence on June 24, 1971 and thereafter made findings of fact. The court found that established police procedure required the police to inform Mills that he might post collateral for the traffic offense. The court found, however, that the second and third questions posed by the remand order could not be answered. Specifically, the court found that notwithstanding the appellant's "apparent candor" in answering certain questions on the subject his "incontrovertible" testimony was insufficient to support his counsel's "assertion" that he *clearly* was not given the opportunity to post collateral". (emphasis in original) The court concluded that whether Mills was given that opportunity remained "unclear" because (1) the stationhouse clerks and transporting officers on duty when Mills was booked were unable to recall what had occurred; (2) the government had been unable to locate two other officers who were present that night; (3) Craig Tatum, who was arrested with Mills, also had no recollection of the matter; and (4) Officer Ivery, the arresting officer, died in line of duty shortly after the trial of the case. In the circumstances the court found that questions two and three could not be answered, that any answers would require "speculation". The court did find, however, that Mills knew about the collateral system in general and knew that he could have posted collateral for the offense of not having a valid driver's permit.[1]

The issues considered by the district court on remand were new issues, injected into the case for the first time by questions from the bench during the argument before this court. Having thus recast the case for the defense, the majority now brushes aside the conclusions of the district court on the new is-

sues and makes its own finding that the police acted improperly. This finding is derived from the testimony of the appellant—hardly a disinterested witness —which the district judge found unconvincing and which the government, because of the lapse of years and through no fault of its own, was unable to controvert. In my judgment this is not the right way to dispose of a criminal appeal. I think we should decide the case on the issues raised and the record made at the trial. We should not retry it years later on a new theory that germinated in appellate cloisters after the witnesses for one party died, forgot the facts, or became unavailable. A criminal appeal should not be turned into a new trial in which the theory and strategy of the defense are refashioned by appellate judges and a judgment of a district court is reversed on grounds that have never been fairly litigated.

MacKINNON, Circuit Judge, dissenting:

I concur fully in Judge Robb's dissenting opinion, but I wish to add one further point. The majority reverses Mills' conviction by holding that the pre-detention inventory search which produced the evidence against him was illegal because he was not expressly offered the opportunity to avoid detention by posting collateral for the relatively minor offense for which he was being arrested. The reversal thus turns on the *single factual question* of whether he was given the opportunity to post collateral at the station house during the booking procedure that ultimately included the search declared illegal today.

As discussed more fully in Judge Robb's opinion, this question was neither raised nor decided in the trial below, thus necessitating the remand proceedings we ordered to examine the circumstances of Mills' booking. Because of Officer Ivery's intervening death and the inability of any other party to the book-

---

1. Mills was not a guileless innocent. He is now serving a sentence for violations of the federal narcotics laws that occurred

on December 19, 20, and 28, 1967. *See* United States v. Mills, 149 U.S.App.D.C. 345, 463 F.2d 291 (1972).

ing procedure to recall any details thereof, the remand proceedings were almost wholly unproductive of relevant evidence concerning Mr. Mills' booking. Coupled with the majority's decision to entirely disregard Mr. Mills' version of the events leading to his search, we are left with no direct evidence in this record on the critical question of whether he was given the opportunity to post collateral. The majority's conclusion that Mills was denied that opportunity thus rests entirely on inferences drawn from circumstantial evidence of very limited probative value.

Attempting to bolster their argument with testimony from the key Government witness—Officer Ivery—the majority, however, seeks to draw that inference from testimony that is not relevant to the question the majority opinion is based upon:

At trial, Officer Ivery testified that when he arrested Mills he did not ask whether Mills had sufficient money to post collateral for the offense . . . (majority opinion at 12)

The testimony to which this statement refers is as follows:

[Defense counsel]. Did you ask Mr. Mills whether or not he had sufficient money to post collateral for the offense you intended to charge him with?

[Officer Ivery]. No, sir, I did not.

Q. At that point you called the scout car from the station.

A. I called a scout car as soon as I felt it was necessary. I don't know at what point it was. (Tr. 47–47a)

This colloquy referred only to the time when Officer Ivery initially stopped Mills on the street—before he had verified that Tatum, the registered owner of the car, had authorized Mills to drive it. At that point in time, the facts known to Officer Ivery required him to consider the possibility that the car might have been stolen. Since auto theft is not a minor offense for which collateral may be posted, Officer Ivery's failure to men-

tion collateral to Mills at this time is absolutely irrelevant to the question of whether, having eliminated the possibility of such charges, Officer Ivery subsequently gave Mills the chance to post collateral at the station house.

Following its summary of Officer Ivery's testimony, the majority opinion concludes that

the foregoing record amply establishes that Mr. Mills was not given an opportunity to post collateral.

In addition, we note that there is not a glimmer of a suggestion in Officer Ivery's testimony—in either direct or cross-examination, either at the pretrial hearing or at trial—that the booking of Mr. Mills, and conduct of an inventory search incident thereto, was accompanied by a reference, avowedly not accorded on the street, to any opportunity to post collateral. (majority opinion at 1237)

It is a grossly improper evaluation of the testimony to say that "the foregoing record *amply establishes*" (emphasis added) the fact. The majority blithely ignores the fact that the reason Officer Ivery's testimony is devoid of such a suggestion is that he was *never* asked whether Mills had been given a chance to post collateral when he was booked. So it is equally true that Officer Ivery's testimony reveals "not a glimmer of a suggestion" that Mr. Mills was *not* accorded "any opportunity to post collateral" at the station house. The majority's conclusion is at best completely speculative and at the worst plainly erroneous. The direct evidence in the record, both at trial and at the remand hearing, is wholly silent on the question of Mills' opportunity to post collateral. To the extent that the majority relies on Officer Ivery's testimony, it reaches a conclusion on an issue that was not being litigated and concerning which the witness never addressed himself. His intervening death makes the majority's use of his testimony to support their speculative inference a matter of great consequence—to this case and to our

system of justice. It refuses to conform to established appellate procedures in criminal cases.

I am authorized to state that Judge Robb concurs in this opinion.

WILKEY, Circuit Judge, dissenting:

I concur in the dissent of Judge Robb. I also would like to state briefly an additional reason. My analysis of the facts relied on by the majority is:

1. At the stationhouse the defendant Mills knew he had a right to post collateral and avoid confinement.

2. The defendant apparently was under a misapprehension that he would be detained at the stationhouse, whether he was able to post collateral or not.

3. The defendant failed to clear up his own misapprehension by asserting his known rights to post collateral and thus avoid detention.

4. If the defendant had said "I want to post collateral," on the version of the evidence necessarily relied on by the majority opinion itself, it is clear that defendant would have been released without the search which took place.

5. A reasonable routine administrative search cannot be vitiated because the defendant himself failed to speak up. The test is not as the majority considers it, whether the police officer spoke up— the purpose of that would be to *inform* the defendant of his right to post collateral. This the defendant *already knew.*

6. Finally, *the police officer knew that the defendant knew!* The defendant had loaned the money and had seen his friend Tatum post collateral and be released, all in the presence of the police officer. So there was *no reason* for the police officer to speak up and tell the defendant Mills what he must have already known.

In my view, it is sufficiently irrational to exclude evidence and permit "[t]he criminal . . . to go free because the constable has blundered," [1] yet the courts

occasionally do it because that is the law established by the Supreme Court. But in Mills' case, it wasn't the constable who blundered—it was the criminal! By what rationality, then, should the criminal go free?

---

1. See People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.), cert. denied, 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784 (1926), and cases there cited.