**WASHINGTON MOBILIZATION COM-
MITTEE et al., Plaintiffs,**

v.

**Maurice J. CULLINANE, Chief of the
Metropolitan Police Department,
et al., Defendants.**

**Civ. A. No. 779–70.**

United States District Court,
District of Columbia.

July 28, 1975.

Judgment Aug. 27, 1975.

John E. Vanderstar, John H. Quinn, Jr., Lawrence H. Mirel, Ralph J. Temple, Washington, D. C., for plaintiffs.

C. Francis Murphy, Corp. Counsel, D. C., John A. Earnest, Robert J. Sher, Richard G. Wise, Asst. Corp. Counsels, Washington, D. C., for defendants.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

WADDY, District Judge.

### Introduction

During the period 1969–1971 [1] a number of large-scale demonstrations took place in the District of Columbia to protest various actions taken by the federal and city governments. Participants sought to exercise their rights under the First Amendment peaceably "to assemble, and to petition the Government for a redress of grievances." Plaintiffs in this action are two organizations which had sponsored demonstration activities and individuals who had become involved in the demonstrations as participants, attorneys or observers.[2] Their complaint challenges the policies and actions of the District of Columbia police department during these mass demonstrations. Four general areas of unlawful conduct are alleged as the source of these claims: (1) unlawful dispersal and arrest of demonstrators; (2) use of excessive physical force; (3) unlawful post-arrest, booking procedures; and (4) unnecessary and discriminatory fingerprinting and photographing of demonstrators arrested on disorderly conduct and related charges. Plaintiffs further attack the constitutionality of statutory and administrative enactments invoked by defendants in the performance of their duties. Equitable relief is sought which would require the police department to revise its practices and procedures in a manner which will rectify the claimed constitutional deficiencies.

Defendants are supervisory officials of the Police Department who allegedly

1. Demonstrations occurring subsequent to the filing of the complaint were stipulated to (see Pretrial Orders of March 30, 1971 and March 11, 1974) and evidence relating to them was admitted. The complaint is amended to conform to the evidence. F.R. Civ.P. 15(b).

2. Plaintiffs alleged in their complaint that they represented a class of all persons who have been or intend to become involved in public demonstrations in which first amendment rights are asserted. Defendants have made reference to the fact that plaintiffs did not file a motion to certify this a class action, pursuant to Rule 1–13 of the rules of this Court. The latter rule, however, was not promulgated until August, 1973, subsequent to the filing of this lawsuit. When the action was filed in 1970 plaintiffs were obliged only to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, which have been met by the complaint. It should also be pointed out that defendants tacitly conceded the propriety of having this proceed as a class action by their assent to the presentation of evidence at trial which clearly would have been immaterial had this case not presented issues of class-wide relief. Accordingly, the Court has allowed plaintiffs to proceed as representatives of a class consisting of all persons who have participated in or observed and who intend to participate in or observe lawful, peaceful, orderly and non-obstructive public demonstrations for the exercise of their constitutional rights of free speech and assembly.

Plaintiff Nickerson, however, who seeks to represent a class of attorneys who have counselled or will counsel persons arrested in demonstrations, has not alleged or proven sufficient facts to meet the four requirements of Rule 23(a). A similar defect is found in the allegations of the two organization plaintiffs, which failed to show that they continue their activities or that they have a direct interest in the outcome of this action. The Court believes that plaintiffs Nickerson, Washington Mobilization Committee and the Committee To Defend the Conspiracy cannot fairly and adequately represent and protect the interests of the classes they seek to represent.

are responsible for the actions cited by plaintiffs.[3] They contend in their defense that they have not overstepped the bounds of constitutional propriety and that their actions have been consonant with the due process and first amendment rights guaranteed to all citizens. Defendants argue that even if there have been incidents in the past in which individual officers have acted improperly, this finding would not warrant the extensive injunctive relief sought by plaintiffs.

This Court has jurisdiction over the subject matter and parties of this action pursuant to D.C.Code § 11–521(a)(1).[4] Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 and the 1st, 4th and 5th amendments to the constitution. *Sullivan v. Murphy*, 156 U.S.App. D.C. 28, 478 F.2d 938 (1973).

The case was tried before the Court sitting without a jury. The trial was conducted from March 19 to April 9, 1974.[5] Plaintiffs presented the testimony of 25 witnesses at trial and the testimony of 3 additional persons by deposition. The trial was shortened by an agreement between the parties permitting plaintiffs to introduce into evidence the affidavits of 47 potential witnesses whose testimony would merely have been cumulative of the evidence introduced through plaintiffs' primary witnesses. The affidavits were admitted only as summaries to show what these persons would have testified to if they had been called as witnesses. The veracity of the affiants or of their statements was not stipulated. Finally, plaintiffs intro-

duced well over 100 exhibits into evidence including police department documents, interrogatories and depositions. Defendants presented at trial the testimony of ex-Chief Wilson and other supervisory officials of the department who were responsible for the training, supervision and discipline of officers assigned to duty during mass demonstrations. Defendants supplemented this testimony with 21 exhibits introduced into evidence, consisting of internal memoranda, orders and documents of the department.

█ In order to obtain the relief they seek, plaintiffs must prove that the police have engaged in widespread violations of constitutional rights; that such breaches of official duty have occurred over a period of time and are subject to repetition; and that the misconduct either has resulted from departmental policies and procedures or lack thereof, or has been fostered by the department's failure to take corrective action. *See Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Washington Free Community, Inc. v. Wilson*, 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973); *Long v. District of Columbia*, 152 U.S.App.D.C. 187, 469 F.2d 927 (1972); *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966). In an effort to satisfy this burden, plaintiffs have produced evidence depicting the events of demonstrations occurring in the District of Columbia during 1969–1971. Defendants' evidence concentrates on the guidelines developed by the department during this time period in an effort to show

3. The original defendants were Jerry V. Wilson, Chief; Owen Davis, Deputy Chief and Commander of the Civil Disturbance Unit; Captains Charles M. Monroe and Earl Drescher, supervisory officials of the Civil Disturbance Unit; and Raymond S. Pyles, a supervisory official involved in the processing of arrestees. Three of these positions have since been filled by other officials who are substituted as parties pursuant to Rule 25(d) of the Federal Rules of Civil Procedure: Chief Maurice J. Cullinane; Deputy Chief Robert L. Rabe; Assistant Chief Theodore R. Zanders. Charles Monroe has

since been appointed a Deputy Chief of Police and is still named as a defendant in that capacity. Earl Drescher was dismissed as a defendant in this action at the time of pretrial, with the consent of all parties.

4. This action was filed prior to the effective date of the D. C. Court Reform and Criminal Procedure Act of 1970, which repealed this provision.

5. Previous dispositions taken in this case were the denials of motions for temporary restraining order (March 17, 1970) and for preliminary injunction (April 13, 1970).

that any misconduct was individually inspired, rather than the outgrowth of officially sanctioned policies, and that the department has actively sought rectification of the deficiencies in operating procedures.

## FACTS

### 1. *The Civil Disturbance Unit*

The evidence in support of and in opposition to the respective positions of the parties and the facts deducible therefrom will be discussed hereinafter. At the outset, however, a description of the makeup of the department's Civil Disturbance Unit (CDU) is helpful in understanding the evidence.

The CDU is a special component of the police department established to provide personnel for service during large-scale civil disturbances, including riots and mass demonstrations. Because of the nature of its duties, the Unit is mobilized on an *ad hoc* basis. Organizationally it is part of the department's Special Operations Division (SOD), which has duties extending beyond the narrowly defined scope of CDU activities. Of the approximately 650 officers assigned to the CDU, 300 are drawn from the ranks of the SOD; the remaining officers are regularly assigned to other full-time positions within the department.[6] The Deputy Chief of Police in charge of the SOD is also Commander of the CDU.[7]

### 2. *The Demonstrations* [8]

a. *November 14, 1969—Dupont Circle*

On November 14, 1969, an anti-war demonstration was staged near the South Vietnamese embassy, in the vicinity of Dupont Circle. As the demonstrators became unruly, breaking windows and threatening police, they began to congregate in and around the Circle. Upon orders of Chief Wilson, CDU officers surrounding the area launched tear gas cannisters into the Circle in an attempt to subdue the crowd.

Dr. Timothy Tomasi, a physician who, at that time, was employed as a resident by D. C. General Hospital, volunteered his services to provide first aid. From 6:00 until 9:30 P.M. he was stationed in a house near the Circle where he treated approximately 20–30 persons suffering from tear gas burns, bruises and lacerations. By 9:30 tear gas had seeped into the house, requiring evacuation from the building. Clearly identified by a red cross armband, Tomasi went to the Circle to ascertain if any demonstrators there needed medical attention. At first officers refused to allow him access through the police line surrounding the Circle, but then relented. Finding that his assistance was not needed, Tomasi left the circle just as further tear gas was set off.

As Tamasi approached Massachusetts Avenue, CDU officers grabbed him and struck him a number of times with their clubs, knocking him to the ground. He was then dragged to a police bus and locked in the back. He showed one of the officers his medical identification, but to no avail. A short time later, when officers returned to the bus, he was ordered to leave. As he disembarked some of the officers again struck him across the body with their batons; one officer kneed him in the groin. Tomasi was then allowed to leave, never having been advised that he was under arrest or that he had violated any law.

---

6. These figures are taken from defendants' answers to interrogatories filed February 15, 1975.

7. From 1969 to present, the CDU has had three different Commanders. From 1969 through October, 1970, Owen Davis was Deputy Chief, followed by Theodore Zanders (November, 1970 to June, 1973) and then Robert Rabe (June, 1973 to present).

8. No attempt is made to detail or describe every police/demonstrator confrontation during the demonstrations. Those set forth are representative of the types of occurrences and supply the basis for the Court's findings and conclusions.

b. *November 16, 1969—Three Sisters Bridge*

On November 16, 1969 a large crowd gathered on Canal Road in Georgetown to protest construction of the proposed Three Sisters Bridge.[9] As the crowd became loud and disorderly, the participants began to block traffic proceeding along M Street and Canal Road. Police stationed in the area were subjected to verbal abuse and, in a few instances, were the targets of thrown objects.

Eventually three squads of police were ordered to the area who directed the demonstrators back to the vicinity of 34th and M Streets. Two squads then moved further east along M Street, while the third squad attempted to clear 34th Street by proceeding north along that thoroughfare. At the intersection of 34th and Prospect Streets, a line of police was formed which prevented all pedestrian and vehicular traffic from moving south. Lieutenant Watson, in command of the maneuver, then ordered a sweep of the area by a contingent of officers moving north on 34th Street and east along Prospect Street.

At this juncture, a number of persons who were apparently occupants of a residence at 3401 Prospect Street[10] began shouting obscenities at the officers, but were not otherwise interfering in the police action. Several officers broke ranks and moved to the steps of the house before being ordered to return to their line by superiors. Later, when the police made a return sweep of the area, these same hecklers renewed their activities. At this point, four officers proceeded to the front yard, swinging their batons,[11] and arrested two of the protestors. Lieutenant Watson supported this action, noting that the comments made by the arrestees were "unacceptable in a decent and self-respecting society."[12]

Additional arrests were made along Prospect Street without any apparent probable cause. One witness, Karl Hess IV, was visiting friends living on the 3300 block of Prospect Street. Although not participating in the demonstration, he and his friends went outside to observe the commotion. As the police line moved past the house, Hess retreated to the steps. When one of his friends was detained by police, he attempted to explain to the officer that they were not involved in the demonstration and that they were staying at the above-mentioned house. The officer's response was to walk onto the porch, seize the witness in an excessively physical fashion and arrest him. Hess' father observed this event from inside the house and immediately attempted to explain to the officer that a mistake was being made. The father suffered the same fate as his son, as both were loaded into a patrol wagon and were taken to the local precinct station and booked. Collateral was posted for both and they were immediately released. When the case was subsequently reviewed by the Corporation Counsel, the charges were dropped and the collateral money was returned.

c. *February 19, 1970—Watergate*

On February 19, 1970 a crowd of persons (numbering in the hundreds) gathered on the George Washington University Campus for a rally protesting the results of the so-called Chicago 7 trial. Speakers addressed the crowd during the mid-day and early afternoon with no indications of disorderly conduct. Police were not present or did not make their presence evident on the campus.

---

9. The demonstration was unrelated to the anti-war activities being staged during the same time period.

10. These persons were identified as Georgetown University students.

11. Witnesses testified that other incidents occurred in which police struck demonstrators without provocation, including one person attempting to take pictures of the police activities. Pl. Ex. 135.

12. Memorandum from Lt. Watson to the Commander, Tactical Section, Special Operations Division, December 10, 1969.

Upon completion of the speeches, a large number of the persons attending the rally proceeded to march towards the Watergate apartments intending to reiterate at that location their displeasure with the course of the trial. The Watergate was selected as the site for this demonstration because it was the residence of then Attorney General John Mitchell. Although the demonstrators had not sought a parade permit for the march to the Watergate, notices on campus posted prior to the 19th announced the intended course of the demonstration. The police department was aware of the proposed activities and in anticipation of difficulties stationed a large number of officers from the CDU around the apartment complex.

Most of the demonstrators proceeded towards the Watergate along G Street, moving westward. A few police were observed along this route, although there was apparently no interaction between demonstrators and police at this point. When the marchers reached the intersection of G Street and Virginia Avenue, they were confronted by a police line extending across Virginia Avenue, preventing further movement along this thoroughfare. Estimates of the number of police varied from 50 to 200, the latter figure probably being the more realistic one. The officers manning the line were attired in CDU riot gear, including helmets, combat-type fatigues and long batons, held chest-high in a horizontal position.

When most of the demonstrators had arrived in the vicinity of the Watergate, the crowd extended from the intersection of New Hampshire and Virginia Avenues (where the police line was set up), back along Virginia Avenue to the Columbia Plaza apartments (between 23rd and 24th Streets). A second contingent of police formed along the rear of the group of demonstrators, cutting off retreat eastward along Virginia Avenue.

After realizing that the police were intent upon impeding any further demonstration activities, some of the marchers at the front of the assemblage (at the intersection of New Hampshire and Virginia Avenues) began taunting the officers, verbally and physically. Epithets were directed toward the police, along with small stones and other objects. The evidence shows that this activity was uncoordinated and spasmodic. The missile throwing could hardly have been characterized as a barrage. No evidence of injury to any police officer was introduced. At this point Deputy Chief Owen Davis, in command of the CDU and the senior officer present at the scene,[13] announced over a bullhorn that the crowd should disperse. Davis, however, was situated at the head of the gathering, so that most of the persons in the rear of the crowd (especially around the Columbia Plaza apartments) did not hear the request to leave the area. In fact, the evidence shows that many of these persons were unaware of the confrontation between police and demonstrators further along Virginia Avenue which had given rise to the dispersal order.[14] The situation remained static for a few minutes after the announcement to leave, until the line of police at New Hampshire and Virginia Avenues began moving eastward on Virginia, pushing the crowd ahead of it. At this point confusion seized both the police and demonstrators, as the people at Columbia Plaza were surprised by the movement of the police line towards them. Because of a lack of communication and inadequate attempts to inform the crowd of their intentions, the police succeeded in creating a stampede effect.

13. Chief Wilson did not arrive until later, after arrests had begun.

14. The evidence indicates that there was little violence occurring in the vicinity of the Columbia Plaza, although some water balloons were hurled from upper windows of the building on to police. The situation became more hectic after police decided to initiate arrests of demonstrators in this area.

At first, persons standing on the grounds of the Columbia Plaza apartments were allowed to pass through the line of police at the rear. However, after more of the demonstrators began to verbally and physically threaten the officers, the police broke ranks and began chasing the retreating crowd. This action compounded the confusion and escalated the tension between demonstrators and police. A number of persons huddled in the garage area of the apartment, hoping to avoid any confrontation, were seized and arrested. Demonstrators who were initially led to believe that they could retreat from the Columbia Plaza along Virginia Avenue were suddenly chased by groups of officers and arrested. Many of these persons were confronted by an irresolvable dilemma: if they sought security in the area of the Columbia Plaza they were arrested by the rear contingent of police. Those attempting to leave along Virginia Avenue were chased and, in some cases, arrested by the officers pursuing them eastward along Virginia Avenue.

Most of the persons arrested were not engaging in any unlawful conduct. Some were merely onlookers who were caught up in the melee. Persons who attempted to intercede between police and demonstrators or who requested an explanation from officers as to the reasons for the arrests were themselves taken into custody.

The chaotic atmosphere was further exacerbated by the unrestrained use of physical violence by some of the officers. For some officers, the verbal abuse hurled at them was sufficient provocation for their reaction. Numerous incidents occurred (including some visible on films of the event taken by police officers) [15] in which police swung their batons in an overhead movement, knocking their victims to the ground and often inflicting injuries.[16] Some people were observed to be bleeding from the injuries sustained. In at least two incidents medical students who were present at the demonstration (but not participating) attempted to give assistance to injured persons and were told by police to leave the area. In addition to the more blatant examples of violence, a pervasive pattern of lack of restraint by police was discernible from the police films and supported by the testimony of witnesses. Police often shoved and pushed demonstrators, intimidating them with their batons. Arrests were effectuated with a level of force far in excess of that required.

The area along Virginia Avenue was eventually cleared by attrition and by the movement of demonstrators eastward on F and G Streets and north on 23rd Street. These thoroughfares pass through the central portion of the George Washington University campus. As might be expected, many of the people in this area were students or university personnel engaged in their collegiate routine, unassociated with the influx of demonstrators.

Although there undeniably was some unruliness on the part of the crowd leaving the Watergate, including the destruction of property, the evidence is overwhelming that most persons arrested in this sortie were not engaged in criminal activity. Nicholas Sloan, a professor of engineering at George Washington University, testified to one such incident. Sloan arrived at one of the classroom buildings for a class scheduled

15. Defendants' exhibit X.

16. In one incident a scuffle occurred between a demonstrator wielding a long pole and an officer who was trying to apprehend him. The officer eventually cornered his prey and began to strike him. One witness who testified at trial attempted to intercede by trying to pull the officer away. At this point, a second officer left his position in the police line and struck the witness over the head with his baton. The witness incurred a concussion as a result of the blow and was hospitalized. The officer who struck her was verbally reprimanded for leaving the police line and for improperly using his baton, but was not otherwise disciplined for his conduct.

for 6:10 P.M. and was told that the building was closed and that classes were suspended because of the disturbance. A guard allowed Sloan inside the building, where he could observe the events taking place outside. Shortly afterward, one of his students came to the door of the building to ascertain the status of the class. As the student was standing at the entrance to the building, he was grabbed from behind by an officer. In spite of Sloan's efforts to have the student released, the officer persisted and maintained custody. Defendants proffered no evidence to justify this or similar arrests of persons who were not connected with the demonstration activities.

Wanton use of physical force also accompanied the arrests made on campus in the late afternoon. One example of such violence occurred when CDU officers entered a school building, contrary to orders, to pursue demonstrators who had been throwing rocks at the police. Michael Marsh, a law student who had observed the incidents but was not participating, approached the officers entering the building and attempted to intercede peaceably between them and some other students. There is no evidence that Marsh had engaged in any illegal conduct on the street or when approaching the officers. There is no evidence that he was interfering with the officers in the performance of their duties. Nevertheless, he was struck on the head by one of the officers swinging his baton as a club. After incurring several blows, Marsh was dragged from the building. Although he was bleeding profusely, his requests for medical attention were ignored for several hours, until after he had been brought to the police station. Marsh was eventually hospitalized for treatment of his injuries (including stitches in his scalp) and then returned to police custody. Later

that night collateral was posted and Marsh was released. Charges against him were subsequently dropped.[17]

The arrest and booking procedures employed by the CDU were also extraordinary. Although the department had devised a field arrest form specifically for use in mass arrest situations, a number of administrative snafus prevented its use on this day (e. g., shortage of cameras). In addition, many officers decided that it was not necessary to advise arrestees of the charges being placed against them or to give them their *Miranda* warnings.

Arrestees were taken either to the Central Cell Block (males) or the Women's Detention Center (females). At this point, essential information was recorded on various forms and the detainees were fingerprinted and photographed. Because of the large number of people involved and an apparent breakdown in police administration, the process dragged on for hours.

Even during the booking process many detainees were not advised of the charges against them or the procedures for posting collateral. Persons who offered to post collateral immediately and were able to do so were required to wait hours before their release. Many persons were not allowed to leave on collateral until they answered a barrage of questions of a personal and extraneous nature (e. g., what do you smoke, what persons do you associate with, do you use narcotics). Persons requesting use of the telephones to contact an attorney or to obtain collateral were prevented from so doing. At the central cell block, which had only two telephones available for the use of prisoners, the influx of such a large number of arrestees overwhelmed the facilities. Even at times when the phones were not being used, some officers rejected requests to make calls. Attorneys who came to the cell

---

17. Marsh brought a civil action for damages as a consequence of this incident. Judgment was recently rendered in his favor and damages in the amount of $5,500.00 were award-ed. *Marsh v. Hollingsworth*, Civil Action No. 392–71 (D.D.C. Jan. 2, 1975) (Parker, J.).

block were thwarted in their efforts to speak to or advise those persons still incarcerated. These actions by police resulted in delays of nine or more hours before some detainees were released.

Because of the failure to use the field arrest forms and the confusion during the booking process, most of the arrests made could not be prosecuted by the Corporation Counsel's office. Thomas Johnson, the Assistant Corporation Counsel responsible for reviewing the charges brought against persons arrested during these demonstrations,[18] testified that more than 90% of the persons arrested had their charges "no-papered" (i. e., no complaint was filed). Of the remaining cases which were prosecuted, a majority resulted in dispositions favorable to the arrestees. Johnson offered a number of reasons for the unsuccessful resolution of so many of the cases. Foremost was the inability of the arresting officers to identify at a later date the persons they had taken into custody or the offense allegedly committed. The absence of field arrest forms made identification impossible. In many instances the charge designated by the officer at the time of arrest did not fit the facts of the incident giving rise to the arrest. In those cases in which people were charged with violating a police line, there were problems with the police tactic of moving with or pushing the crowd and then cutting it off from further movement out of an area. Questions arose whether people had attempted in good faith to comply with the order to disperse, but were prevented from doing so by the police. These observations led Johnson to testify:

> I personally have never seen a good police-lines case, that is my understanding of a good police-lines case. Those that I did see either the line would not have been established at all,

or the line was established and moving and engulfed someone. In the latter case, I don't understand that to be a proper charge.[19]

d. *February 21, 1970—Washington Monument*

A second demonstration protesting the Chicago 7 trial took place on February 21, 1970, in the downtown area of the city. A police permit for the demonstration was issued on the day prior to the march, allowing the assemblage of approximately 5000 persons in the vicinity of 9th Street and Constitution Avenue. The marchers were to proceed to the destination of 3rd Street and Constitution Avenue, near the location of the police department's central cell block. The demonstration proceeded uneventfully along its prescribed route, with little contact between demonstrators and police.

After the scheduled event ended in the late afternoon (approximately 4:00 p. m.), many of the demonstrators began walking westward in the mall area. As these people approached the vicinity of the Washington Monument (15th Street and Constitution Avenue), a number of police on scooters, motorcycles and horses circled the crowd and formed a line along the hill of the monument, preventing further movement in a westerly direction. Shortly thereafter a group of CDU officers in riot attire, under the supervision of Chief Wilson, formed a line along Constitution Avenue north of the Monument. The crowd consisted of tourists and onlookers as well as stragglers from the march.

For reasons which were not made clear at trial, the police line extending east-west along Constitution Avenue began moving south in formation, across the monument grounds, sweeping people ahead of it. Although an announcement to clear the area was made, because of

18. Johnson's testimony referred to arrests made on both the 19th and 21st of February. Events taking place on the latter date are discussed in the succeeding section.

19. Testimony of Thomas Johnson, March 20, 1974, Tr. 7.

the noise of the crowd, not all of the persons subject to the order heard the instructions. As a result, there was confusion among demonstrators and bystanders as to the appropriate course of action. The chaos was magnified when police broke ranks and began chasing people across the mall, making random arrests. A number of persons were physically assaulted by police officers using their batons as clubs. Persons who attempted to question police about the arrests or to protest their conduct were themselves apprehended. One news reporter who was taking notes during the demonstration was accosted from behind by an officer, choked with the officer's baton, and then forced to relinquish his notebook. After the officer had defaced the notebook, he left the scene and took no further action.[20]

Films of the demonstration taken by the police department [21] confirm the abusive character of the officers' actions. Two incidents in particular, occurring on the Mall in the vicinity of the Justice Department, highlight this fact. In the first example, a person was pulled from the crowd by police officers and dragged to a grassy area. The victim was then thrown to the ground, beaten and kicked by a number of officers who had encircled him. Whatever conduct on the part of the demonstrator had provoked official action, it was quite evident that the physical force far exceeded what was necessary to bring the person into custody. In the second incident, a person carrying a large movie camera (the kind used by the news media, although it is not clear whether the person was a member of the press) was pushed away by officers as he attempted to film some of the events. Although he appeared to offer no resistance, a scuffle ensued in which officers tried to pull the camera away from the photographer in order to prevent further picturetaking.

Witnesses testifying for defendants stated that a number of demonstrators in the area of the Monument had become disorderly. However, these witnesses did not recite specific instances of misconduct which would have necessitated the sweep action, as opposed to making individual arrests. There were no satisfactory explanations for the physically abusive behaviour of the police.

The arrest and booking procedures which followed were also of questionable propriety. A number of persons who were injured in the fracas requested and were refused medical attention at the time of arrest; in some cases medical care was not ministered until the arrestees were taken to the cell block. While in custody the arrestees were subjected to verbal and other abuse,[22] and were often not advised of their rights or the charge(s) being placed against them until hours after the arrest took place. Some persons were not released for five or more hours.

### e. October 2, 1970—Georgetown

During the evening of October 2, 1970, a political demonstration took place in Georgetown. Chief Wilson was present at the scene of the protest and ordered a sweep of the lower blocks of Wisconsin Avenue. Defendants presented no evidence to indicate why this step was taken. One result of this decision was that a number of passersby and persons uninvolved with the demonstration were arrested in the Georgetown area.[23]

In one incident, Peter Lamb, an attorney visiting friends residing on Wisconsin Avenue between Q and R Streets, was attracted to the disturbance taking place outside. He observed a line of

20. A complaint concerning this event was made to the police department by the reporter's newspaper, but no action was taken.

21. Defendants' Exhibit U.

22. One female was subject to a search of her vaginal and anal cavities.

23. The Court takes judicial notice of the fact that Georgetown is a popular shopping and social area of the city which attracts large numbers of persons.

40–50 police moving north on Wisconsin Avenue, with persons being pushed along ahead of the line. When Lamb observed the police making an arrest which he considered unjustified, he approached the officer involved and asked why the arrest was being made. Lamb did not attempt to interfere with the officer's activities, but merely sought an explanation of his conduct. Lamb himself was then arrested.

At the police station, Lamb was not permitted to make a telephone call for at least 6 hours, although he eventually was able to effectuate his release. After the charges against him were dropped, Lamb complained in writing to the police department of his treatment. The department's response was that it found no improprieties in any officer's conduct on that particular day.

f. *May 5–11, 1970—American University/Ward Circle*

In the first few weeks of May, 1970, demonstrations protesting the activities of armed forces of the United States in Cambodia took place in various areas of the city. One such area of demonstrations was around the campus of American University. These demonstrations resulted in a number of confrontations between police and persons present on the campus.

The initial demonstration activities on May 5 consisted of leafletting the area of Ward Circle adjacent to the campus (the Circle is the location of the intersection of Massachusetts and Nebraska Avenues, both heavily-travelled thoroughfares). Police were stationed at that location as a precautionary measure, although the initial interaction between officers and demonstrators was minimal. On May 6, however, when the leafletters began to block traffic in the

Ward Circle intersection, the tension between the groups increased. CDU officers wearing gas masks and equipped with various gas projectiles were stationed around and in the Circle, facing the campus. Demonstrators were requested to vacate the streets and most did so, retreating to a grassy knoll in front of the Kay Spiritual Life Center, a university building located on the edge of the campus.

It is unclear from the evidence which of the adversaries initiated the escalation. Demonstrators taunted police and threw marshmallows at them. After announcements to clear the area were made, the missiles changed to stones and rocks, inflicting injuries on a few officers. Lines of CDU police moved onto Nebraska Avenue, pushing the demonstrators back with their batons, but they were not successful in clearing the area or in stifling the bombardment of missiles. Deputy Chief Davis finally ordered the use of hand-thrown gas grenades, generally thrown from the north side of Massachusetts Avenue to the campus area by the Kay Spiritual Life Center. When these proved ineffective, larger projectiles (about one foot long) were fired from shotgun-like launchers. This action had the effect of saturating the immediate vicinity with gas, affecting numerous people who had no connection with the anti-war activities.

Persons brought to the first aid station set up on campus were found to have suffered numerous injuries in the course of this conflict (e. g., abrasions, contusions), in addition to the effects of tear gas.[24] Police films of the activities on May 5 and 6 show that on several occasions arrests were effected by placing choke-holds with the baton around the necks of arrestees.[25] Some of the in-

24. In one incident a student acting as a volunteer medic (and identified as such) began assisting a demonstrator who was bleeding from the mouth. When the medic continued to treat the injury after an officer told him to cease, he was arrested. Affidavit Robert Brown, Pl. Ex. 140.

25. In these incidents, a number of officers stood by while a single officer would apply this choke-hold to the arrestee. Even if the victim was resisting arrest (which is not evident from the film), there were sufficient officers available to bring the person into their control without resort to the potentially dangerous tactic employed.

jured required hospital treatment, although it appears that the police provided no medical facilities or services.

A second major flare-up between police and demonstrators occurred on the 11th day of May. The conflict again was ignited in the Ward Circle area, where students engaged in leafletting and other less peaceful activities. Rocks and debris were thrown in the streets. The police attempted to clear the thoroughfares around the Circle, but met the same resistance as before. Missiles were again directed towards police stationed at the Circle, ranging from marshmallows to rocks. What seems to have distinguished the course of events on this date from the conflagration occurring the previous week was the increased intensity of animosity between protestors and law enforcement officials. This attitude was reflected in the severity of injuries incurred by persons in the area.

Police officials again decided to employ shotgun gas launchers, with heavy, long-range projectiles. A number of officers using these launchers apparently took the view that they were appropriate offensive weapons, rather than merely being a means of dispersing the crowd. In at least three separate incidents, persons present in the campus area were deliberately made the direct targets of these weapons. Perhaps the most graphic example of this misuse of the gas launchers involved James Lee Kerr III, a student at American University. Kerr was editor and photographer for a number of campus publications and was identified by a press pass on his lapel. On May 6 he was present at Ward Cir-

cle, taking still photographs of the events. He returned on the 11th with a movie camera. While walking along Nebraska Avenue on the latter date, taking pictures, he was struck in the heel of his foot by a gas cannister and was knocked to the ground. As he tried to crawl away, another officer approached him and, from close range, shot Kerr in the ankle with another projectile. Two friends knocked the officer away, allowing Kerr to escape. Subsequent medical treatment revealed a broken bone and damaged ligaments, from which Kerr still has not fully recovered. A second example of misuse of the gas launchers is described in the affidavit of Gregory Hutchins.[26] Hutchins was struck in the shoulder by a cannister as he attempted to leave the sidewalk along Nebraska Avenue following the dispersal order. There is no evidence in the record which would justify the conduct of the police in these incidents. There also is no dispute that both Deputy Chief Davis and Chief Wilson were present at various times during the demonstrations at Ward Circle and were responsible for the orders initiating the use of gas.[27]

In addition to Kerr, other actions were taken by police against persons who were clearly associated with media organizations. On May 11th, the University radio station (WAMU) was operating a broadcasting station on campus, giving continuous news coverage of the demonstrations. For reasons which were never related to the persons operating the station, a number of officers approached the broadcasters, confiscated a telephone and disconnected the transmission line which had been set up

26. Pl. Ex. 140.

27. Another example of the misuse of tear gas by the police is found in the testimony of John Gershon, a witness who testified that during this first week of May he was on the George Washington University campus as a volunteer medic during demonstrations in that locale. At one point, while aiding a person in the street who had been incapacitated by Mace, Gershon observed an officer in a police line fire a gas projectile at him from close range. The missile missed Gershon's head by about three feet. Following this incident Gershon retreated to a nearby church which had been designated a first aid station. In spite of the fact that people around the church were clearly identifiable as medical personnel, police proceeded to saturate the area with gas, requiring the witness' evacuation from the station.

for the emergency operation. This had the effect of abruptly ending the station's broadcast. Deputy Chief Davis testified that he ordered the equipment disconnected, but was not aware that the students were running a radio station. When an employee of the radio station approached Davis at his outpost in the middle of Ward Circle, Davis told him that it was his understanding that the broadcasters were using the operation as a device for centrally directing the activities of the demonstration. Davis did not explain the basis for this assumption and was unable at trial to substantiate his hypothesis. After the discussion at the Circle the equipment was returned to the station.

Two final examples of excessive force illustrate the lack of restraint on the part of police. In one incident, a number of students forsook the intensity of the Ward Circle battleground for the challenge of a more leisurely afternoon softball game. Upon completion of their sport some of the participants drove their cars to a parking lot on Nebraska Avenue, across from the campus, and visited friends in a nearby dormitory. When they returned to their cars in the late afternoon, they heard the instruction to disperse from police stationed at Ward Circle. They also observed the release of tear gas onto Nebraska Avenue. At this point, four or five officers ran into the parking lot chasing a student. One of the officers then approached a car with a number of students inside, drew his revolver and yelled accusations at the passengers. When two of the softball players proceeded to the scene of the altercation another officer seized them and accused them of rock-throwing. The officers addressed one student as "Jew boy" and then pulled his beard and slammed his head into the trunk of the car.[28] The officer who drew his revolver was later reprimanded verbally by

his superiors for improper use of his service weapon, but no disciplinary action was ever taken.[29]

The second incident involved Dr. Robert Strautz, a professor of biology at American University, who was conducting diabetes research in a laboratory in the Hurst Hall campus building, adjacent to Nebraska Avenue. Shortly after the police had begun to use gas, some of the chemical seeped into the laboratory, requiring the professor to evacuate. When he returned, he discovered that some of his experiments utilizing animal subjects had been destroyed by the effects of the gas. Cloaked by his white laboratory coat, the professor went outside to protest the use of the gas to officers stationed in the vicinity. One of the officers, a member of the CDU, drew his pistol, pointed it at the complainant and then escorted him to the Ward Circle area. Although he was verbal and profane in his protests, no attempt was made by Strautz to interfere with the officers' activities or to resist their hold on him. Nevertheless, for unexplained reasons, the officers beat the professor with their batons and then arrested him. There is no evidence that the arrestee had engaged in any unlawful conduct or that his actions required the physical force employed by the police.

### g. *May Day Demonstrations 1971*

The notorious May Day demonstrations of 1971, taking place on the second through fifth days of that month, were the last major mass arrest situations occurring in the District, although the CDU has been deployed on other occasions since that time. Plaintiffs have not presented extensive evidence pertaining to activities during this time, primarily because the facts have been reviewed in detail in previous litigation in this Court and in the United States

---

28. Affidavits of Randy Roth and Richard Taxin, Pl. Ex. 140. These students previously involved in the softball game were arrested at the time of this described inci-

dent, but later had the charges dismissed by the prosecutor.

29. The officer subsequently resigned from the department.

Court of Appeals. *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 478 F.2d 938 (1973); *Roberts v. Wilson*, C.A.No. 1436–71, *aff'd per curiam*, D.C.Cir. No. 72–2184 (Jan. 16, 1974). The patterns of improper arrests and booking procedures (including suspension of the use of field arrest forms) in the previous demonstrations were repeated here.

Especially important are the findings made in the *Sullivan* case as to the number of arrests and prosecutions. During the period April 22, to May 6, 1971, a total of 14,517 persons were arrested. Approximately 3,749 of these cases were terminated administratively, before judicial action was taken. Of those cases that proceeded to the District of Columbia Superior Court, many were terminated because the collateral was forfeited. However, 2,600 persons who posted collateral and were assigned trial dates had their cases dropped when the Corporation Counsel did not file an information. Approximately two-thirds of the cases that went to final disposition in Superior Court were terminated either by entry of a *nolle prosequi* or the granting of a motion to dismiss the information. Only 871 cases out of the original 14,517 arrests went to trial.

■ In order to properly have this information before it, the Court has taken judicial notice of the proceedings and findings of the Courts in the *Apton, Sullivan* and *Roberts* cases. *See Booth v. Fletcher*, 69 U.S.App.D.C. 351, 101 F. 2d 676 (1938), *cert. denied*, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939).

### 3. *Recruitment and Training of CDU Officers*

Members of the CDU are selected from the ranks of officers already as-

signed to other divisions of the department. The selection process consists of a single interview of the applicant and review of his police record by the training officer of the Unit. No psychological tests or other screening devices are administered.

The initial training consists of a 6-day course of classroom and field instruction. Three-day refresher courses are conducted twice a year. Informal, in-service training is also utilized as the occasion arises. The classroom curriculum for the initial and refresher courses includes such topics as completion of field arrest forms, psychological behaviour of crowds and effects of chemical crowd control agents (*e. g.*, gas). Field training is directed primarily towards the use of weaponry. Oddly enough, the one weapon responsible for most injuries inflicted during demonstrations—the riot baton—has not been the subject of field training since 1969. Officers are merely instructed verbally that the baton is a defensive weapon and should not be used to strike persons except in situations involving physical danger.

The CDU does have an instruction manual.[30] It was agreed by all police officials testifying at trial that the manual, written in 1948, is hopelessly outdated and virtually useless. For this reason, it has not been used since 1969 in any of the Unit's training programs. Chief Wilson testified that a revision of the Manual is in progress, with no scheduled deadline for completion. The Court has viewed the proposed revisions and notes that they are, at best, in a preliminary stage of review.

The Department has supplanted the manual as a source of policy by verbal orders[31] or written General Orders.[32]

---

30. Pl. Ex. 14.

31. Deputy Chief Zanders stated in a deposition in evidence that no changes had been made in CDU policies while he was commander (1970–1973). Pl. Ex. 119. At trial, Zanders qualified his original assessment,

stating that no *written* policy changes had been made, but that changes were instituted through verbal orders.

32. An example of a General Order is Series 502, No. 1, March 1, 1972, SUBJECT: *Processing Prisoners and Centralization of*

Officers are also exposed to a series of Training Modules which discuss the basic functions of a police officer. It should be noted that the General Orders and Training Modules are directed to all police officers and, although some orders are principally oriented to CDU activities, they do not provide a centralized or comprehensive source of CDU policy. For example, there are no written guidelines on the appropriateness or mechanics of establishing a police line, one of the most widely used crowd-control tactics. Furthermore, the documents comprising these disparate policy pronouncements are so voluminous as to make it virtually impossible for an officer preoccupied with the busy pace of his daily duties to digest and retain the mass of information. The difficulty of the task facing the CDU officer would seem to be compounded by the necessity of ferreting out from this maze of papers those orders directly applicable to CDU activities. One might surmise that this haphazard method of instruction would result in a breakdown of orderly operations. The evidence of CDU misconduct during the demonstrations, discussed *supra*, proved this expectation fulfilled.

The shortcomings of the training program are mirrored in the incoherency of official policy, indicating a causal relationship between defendants' actions (or inaction) and the poor performance of CDU officers on duty. This observation is proven in a variety of contexts. A few illustrations should suffice. One example is found in Training Module 7.1 (to which every officer is exposed) which instructs that *Miranda* warnings are to be given to any person subjected to a full custody arrest, including a misdemeanor offense.[33] One of the relevant General Orders also requires an arresting officer detailed to a mass demonstration to instruct an arrestee of the section and description of the law which has allegedly been violated.[34] The evidence shows, however, that it was a common practice for arresting officers to refrain from advising arrestees of their rights and to refuse to reveal the offenses with which they were being charged. This procedure, although contrary to the dictates of the Training Module and General Order, comported with the practice advised by Chief Wilson. In his testimony at trial, Wilson stated that a person taken into custody during a demonstration need be told only that he is under arrest. If the detainee asks, he may be informed that he is charged with disorderly conduct, although the Corporation Counsel's office may decide later that a different charge is more appropriate.

A similar state of confusion has been fostered by conflicting orders and indepth training in the use of chemical agents. The evidence shows that there has been difficulty in containing the use of tear gas in demonstrations. Defendants are well aware of the problem, as shown by a summary of an internal meeting of supervisory police officials held in November, 1969, which contains the following comment:

> All agreed that control is almost completely lacking and that something must be done. Officials loose [sic] control of the use of gas. We must have the ability to stop gasing [sic]. In other words, 'we have the ability to turn on but no ability to turn off.'

In 1971, the department issued General Order No. 1, Series 805 [35] which stated that "[c]hemicals (tear gas, sickening gas, and smoke), arms, and ammunition shall be used by· the CDU in accordance with the instructions of the unit com-

---

*Prisoner Confinement.* The Order contains the following preface: "The purpose of this order is to establish the policy and procedures for centralizing prisoner confinement and for processing prisoners through the Identification Annex, Central Records Division, and district Stations." Pl. Ex. 24.

33. Pl. Ex. 25. Excluded from this rule are minor traffic violations.

34. General Order No. 1 Series 801, December 1, 1971, Pl. Ex. 10.

35. December 1, 1971.

mander." This limited guidance could hardly be termed a significant effort to resolve the difficulties identified two years earlier. Deputy Chief Zanders testified at trial that no written orders were issued during his tenure as the head of the CDU which changed the policies or procedures of the Unit. Defendants offered no proof of specific steps taken to alter the training curriculum to reflect a change in policy on the use of gas. In spite of the observation made in 1969, the misuse or overuse of gas was repeated in subsequent demonstrations. There is no basis in the evidence for concluding that the problem has been resolved.

In a related area, policies regarding the use of Mace emphasize the difficulties growing out of the use of independently promulgated general orders. Memorandum Order No. 42, August 14, 1969, authorized officers below the rank of lieutenant to carry aerosal chemical dispensers (Mace) and set forth certain prescriptions and proscriptions concerning its use, including the admonition that the chemical not be used at close range.[36] On December 1, 1971 the department issued General Order Series 1102, No. 1, which reiterated and amplified the contents of the earlier order. Also on December 1, 1971, a separate General Order identified as Series 805, No. 1, was directed specifically to the Civil Disturbance Unit with the described purpose "to establish the procedure for the utilization of the Civil Disturbance Unit (CDU) in whole or in part, and to establish the criteria for utilization of chemicals under control of the CDU." On page 5 of the latter Order, it is advised that a larger, pint-sized chemical dispenser be assigned only to designated members of the CDU. The Order further stated on page 6 that the chemical dispenser "shall not be utilized against passive crowds or at the scene of a sit-down or arm-lock type of demonstration where the objective is simply to move a group or effect arrests." During the May Day demonstrations of 1971, a photograph was published in the Washington Post which showed Deputy Chief Zanders spraying Mace at a group of demonstrators, sitting in the middle of an intersection, from a distance of no more than three feet.[37] This action seems to violate the policies enunciated in each of the aforementioned orders. When Zanders testified at trial, he did not dispute the inferences of the photograph. When asked whether the policy embodied in General Order Series 805, No. 1, was in effect at the time of the photographed incident, he stated that he did not know if a written order was extant at that time, although the general policy predated that particular order.[38] When asked whether any revised procedures had been adopted following this incident, Zanders replied "I don't recall any." The Court feels compelled to comment that if the Commander of the CDU expresses uncertainty over the existence of his Unit's written policies at a given time, and conducts himself in a manner contrary to those policies, then it is not unlikely that this confusion will also be manifested among his subordinates.

Furthermore, if the policies and procedures of the CDU emanate from verbal fiat and vary with the incumbents of the Commander's position, then consistency and continuity cannot be maintained in the operation, and constitutional rights are at the mercy of personalities.[39]

36. The Order also advised that the chemical should be used in situations in which use of a gun or baton would be justified.

37. Pl. Ex. 142.

38. Testimony Theodore Zanders, April 4, 1974, Transcript pp. 33–38.

39. It is interesting to note that Zanders' replacement as head of the CDU, Robert Rabe, never attended any of the CDU training classes and did not engage in a formal review of the Unit's procedures with Zanders, in spite of the fact that Rabe's previous position was not in the CDU. Although Rabe had had contact with CDU operations in the course of his duties as liaison between the police department and other law enforcement agencies (e. g., Park Police,

#### 4. *Internal Review of CDU Policies*

Department officials have followed an informal procedure for the review and correction of deficiencies in CDU operations. General consideration of official conduct has been undertaken in "critiques" in which supervisory officials discuss the events of a preceding demonstration. Although Deputy Chief Davis testified that on some occasions notes or tape recordings were made of these meetings, no transcripts or tapes were put in evidence. Summaries of a few critique discussions have been made available to the Court, indicating that substantive matters concerning control of both the crowd and the police were scrutinized. However, the department has no policy requiring officials to make written reports or records of such police actions as erecting police lines or initiation of sweeps. The only effort to preserve the events of a demonstration has been the taking of motion pictures and still photographs by the department's Mobile Crime Laboratory. Of necessity, this technique, while valuable, is limited in its adequacy and accuracy.

Criticism of police activities originating from outside the department is handled in a variety of ways. Information critical of the CDU which is presented by the news media or litigation is never made the subject of an internal, disciplinary investigation.[40] When a formal complaint [41] or informal letter is received by the department (or referred to it), it is reviewed initially by the Internal Affairs Division (IAD).[42] The investigation of the complaint, however, is conducted by the unit which was the subject of the complaint. For example, allegations of unjustified physical force by an officer will be investigated by that

officer's unit. After the unit prepares its report of the investigation, it is sent to the Disciplinary Review Officer of the IAD, who may conduct hearings if he thinks it appropriate (although he does not have the power to subpoena persons outside the department). Certain kinds of disciplinary actions may be taken at the unit level by a division commander, such as a dereliction report. Other forms of recommended discipline must be approved by the Chief after the case has gone to the Disciplinary Review Officer (*e. g.*, convening a trial board; official reprimand from the Chief; letter of prejudice signed by the Chief).

The outcome of these procedures as they pertain to CDU activities has not been very productive. Inspector George Chapoutot [43] and Deputy Chief Davis testified that commanders can take and have taken corrective action against officers at the time of a disturbance when they have deviated from department policy or have reacted poorly in the heat of a demonstration. This informal form of discipline might consist of verbally rebuking the official for his conduct, removing the officer from the police line or transferring him out of the CDU. However, in spite of the existence of the above-outlined mechanism for officially disciplining an officer for misconduct, not a single formal disciplinary action was taken against any officer involved in the demonstrations considered in this case.[44]

#### 5. *Processing of Persons Arrested in Mass Demonstrations*

After civil disturbances occurred in the city in the Spring of 1968, the department developed new mass arrest procedures utilizing a shortened field ar-

---

military), the Unit's prior history raises doubts whether this exposure was sufficient to maintain continuity.

40. Testimony of Chief Jerry Wilson, April 8, 1974, Tr. 134–35.

41. A formal complaint is one filed with the Mayor's office and signed under oath.

42. The IAD was established in 1961. Testimony of Chief Wilson, April 8, 1974, Tr. 137.

43. Inspector Chapoutot assumed his position of Disciplinary Review Officer in December, 1971.

44. Pl. Ex. 121, 122. Answer to interrogatory # 151.

rest form which was designed to preserve the essential information relevant to a criminal prosecution.[45] The department also instituted the practice of taking Polaroid photographs of both the arrestee and the arresting officer to accompany the field arrest form. These new procedures allowed the arresting officer to record the basic information of the arrest in a short amount of time.

Difficulties with these procedures arose in demonstrations taking place by the Watergate apartment complex in the winter of 1970, when logistical problems necessitated the suspension of the field arrest process. The response to these problems came in the form of two memoranda issued by Deputy Chief Davis on March 23, 1970, and directed to all members of the CDU.[46] They reiterated the need to follow all aspects of the field arrest procedures and defined certain techniques to be employed in the making and supervision of arrests.[47]

In October, 1971 the department took further steps to improve its procedures for booking detainees by revising its Prisoner Control Handbook.[48] The Handbook puts responsibility for the transporting, detention, processing and controlling of persons arrested during civil disturbances in a Prisoner Control Center, an emergency unit which is activated strictly for this purpose.[49] The Field Arrest Form has been changed in some respects to simplify its use during demonstrations and it has been accompanied by strict admonitions in the Handbook that all parts of the form be accurately and fully completed by the signing officer. Arresting officers are to be designated by superiors. No officer is to be made responsible for more than 15 arrestees. After the arrest forms are filled out and the Polaroid pictures taken, the prisoners are turned over to escort officers for frisking and transportation.[50]

In situations in which a particularly large number of arrests are made or when there is rapid movement among the demonstrators, an abbreviated procedure is followed. The field arrest form is still utilized, but in shortened form, requiring even less time for completion.[51] Information of a general nature (e. g., date, time, location of arrest) is placed on a blackboard attached to the front and side of the transporting bus. When the photograph of the arresting officer and prisoner is taken, it is done in a manner so that the blackboard is in view, with the relevant information filled in. This information is later transferred to the field arrest form at the detention facility. The procedure allows the retention of information necessary to prosecution of the case, but also frees the arresting officer from some of the time-consuming aspects of the arrest.

45. See General Order No. 6, Series 1968, August 16, 1968. Pl. Ex. 4.

46. Shortly after the difficulties in the Watergate demonstration manifested themselves in an inability to prosecute most of the persons arrested, Chief Wilson openly criticized Davis for his decision to suspend use of the field arrest forms. Ironically, in the May Day demonstrations of 1971 Wilson made the same decision to suspend use of the field arrest forms in order to speed up the process of clearing the streets.

47. Pl. Ex. 8, 15. Testimony was also given by Capt. Allen Wolf concerning various field experiments the department had engaged in to streamline the mass arrest process.

48. The handbook notes that the revisions were prodded by judicial criticism of the treatment accorded persons arrested during the May Day demonstrations. Specific deficiencies which the revisions sought to correct included: the assignment of only one arresting officer to a large number of arrestees; the completion of the field arrest forms by officers other than those who signed them; and the use of a general criminal charge without specifically identifying the type of offense.

49. See General Order No. 1, Series 801, December 1, 1971, Pl. Ex. 10.

50. PCC is instructed not to accept prisoners without an accompanying field arrest form.

51. The officer records the name of the prisoner, circumstance of arrest, and the arresting officer's signature, unit and badge number.

Prisoners may be transported to a number of detention facilities in the city, including the central cell block (48 cells), and the seven police districts and sub-stations (120 cells).[52] Once a prisoner has been brought to a facility, the booking process begins with the completion of an arrest report, which includes information taken from the field arrest form and additional facts relating to the personal history of the arrestee. The prisoner is then fingerprinted and photographed[53] and sent through a collateral and/or citation release procedure, whereby he is afforded the opportunity to qualify for release on collateral, citation or unsecured bond, regardless of whether the courts are in session.[54] If the prisoner is unable or refuses to post bond or collateral, he is then detained until called for his court appearance.[55]

Although the Prisoner Control Handbook is more up-to-date than the CDU Training Manual, some of the same problems of inconsistent or non-existent instructions have affected the efficient functioning of post-arrest operations. For example, General Order No. 6, Series 1970[56] states that medical care shall be provided during civil disturbance by public health personnel assigned to district headquarters or substations. Persons suffering serious injuries are to be taken directly to D. C. General Hospital.

A number of witnesses testified, however, that in demonstrations taking place after the issuance of this Order many persons injured in the course of disturbances were not taken to a detention facility or hospital for treatment until the passage of a substantial amount of time.[57] When revisions were made in the Prisoner Control Handbook in 1971 and 1972, there were no modifications or additions to correct the problems encountered in providing medical attention to persons injured at the site of a demonstration. The Handbook mentions only that there is an agreement between the police department and the D. C. Department of Public Health to minister to the medical needs of persons being held in a detention facility.

The Handbook also lacks instructions on the use of telephones by detainees who wish to call an attorney or some other person to arrange the posting of collateral.[58] The problem is compounded by an informal policy of not allowing an attorney to consult with any detainees unless he can give the name of a client. Attorneys representing organizations or from educational institutions who cannot identify specific detainees are not allowed into the detention areas.[59] In many instances the detainee is confronted with a no-win proposition: persons on the outside are unable to assist detainees

---

52. The department also has access to facilities at Washington Coliseum, Kalorama skating rink and United States District Courthouse. In spite of the availability of space, the arrestees from a given demonstration would often be brought to one detention facility, resulting in the overcrowding of cells (up to 10 people detained in a 2-man cell).

53. General Order Series 502, No. 1, March 1, 1972, provides for the fingerprinting and photographing of all persons arrested for disorderly conduct, except that District of Columbia residents with adequate identification need not be subjected to these dual requirements. Pl. Ex. 24.

54. Revision of Prisoner Control Handbook, September 1, 1972. Def. Ex. I–1, p. 53.

55. *Id.*

56. February 11, 1970.

57. The tardiness in the provision of medical care appears to have been caused, in part, by a policy of not transporting arrestees to one of the booking areas until a transport vehicle (*e. g.*, a bus) was completely full. The evidence does not show that the department made available special vehicles for transporting persons in need of immediate medical attention.

58. According to Capt. Allen Wolf, in charge of the detention and processing section of PCC until October, 1972, prisoners are allowed reasonable access to telephones in the detention facilities. The evidence shows that if such was the policy, it was not always carried out by officers involved in the booking process. See discussion, *supra*, of the Watergate demonstration in 1970.

59. Testimony Capt. Wolf, Tr. 18–19.

until they know the identities of the persons arrested, while the latter are prevented from making telephone calls which would allow them to make known the fact of their detention. An official of the department testified that an arrangement was finally made with the bar association to facilitate representation and release of arrested demonstrators, but the details of this agreement were not explicated at trial and are not embodied in any written guidelines.

## SUMMARY OF MATERIAL FACTS

During the mass demonstrations taking place in the District of Columbia in the time period 1969–1971, there were numerous instances of disruptive and destructive behaviour by persons participating in these activities. In response, officers of the CDU repeatedly took actions which were unreasonable and unnecessary in the performance of their duties, including: arresting persons who had not engaged in illegal conduct; excessive use of force; unrestricted and hazardous use of chemical agents (primarily gas); unjustified maintenance of police lines and initiation of sweeps; failure to give sufficient warning to demonstrators of the establishment of police lines; and refusing to advise arrestees of the charges being placed against them or of their constitutional rights under *Miranda v. Arizona*. The failure to use field arrest forms during some demonstrations made it virtually impossible to distinguish between those persons who had been properly arrested and those who had been taken into custody without probable cause.

Preparation and administration of the Prisoner Control Center was also deficient, resulting in numerous examples of actions which were unreasonable and unnecessary in the performance of its duties, including: lengthy periods of incarceration of persons entitled to collateral release; placing detainees in overcrowded cells, restricting access to telephones; failing to provide adequate medical attention; failing to advise detainees of the specific charges being placed against them; and conditioning release on the willingness to answer questions of a purely personal nature and which were irrelevant to the proper processing of detainees.[60]

The persons named as defendants in this action, acting in their official capacities, are responsible for the selection, training and supervision of officers assigned to the Civil Disturbance Unit and Prisoner Control Center during mass demonstrations. The application and selection process devised by defendants for determining which officers will be assigned to the CDU does not adequately identify, to the extent practicably possible, those officers who are not qualified for these specialized duties. Further, many examples of misconduct by CDU and PCC officers were the direct result of policies and procedures authorized by defendants and of defendants' failure adequately to train, supervise and coordinate the activities of subordinates. The CDU training manual, outdated and not in current use, exemplifies the lack of attention to effective training and supervision.

Defendants have not instituted measures which will prevent the recurrence of the kinds of misconduct described herein. Absent corrective action, the misconduct is likely to be repeated in future demonstrations, deterring persons from engaging in such activities.

## LAW

The facts previously discussed raise a variety of legal issues pertaining to both the lawfulness of defendants' conduct and the scope of this Court's power to impose equitable relief, where appropriate. Analysis of the constitutional issues is best begun with the statutes and regulations pursuant to which the police

---

60. Contrary to plaintiffs' assertions, this Court finds that the fingerprinting and photographing of persons arrested in mass demonstrations was reasonable and appropriate to the task of processing detainees.

department is authorized to act. Plaintiffs contend that certain of these enactments may not be applied to demonstration situations in which persons exercise their First Amendment rights of public assembly and free speech. Resolution of these arguments will precede any discussion of the legality of police actions taken to enforce such provisions.

### a. *Disorderly Conduct—Failure to Move On*

The proscription against disorderly conduct is set forth in two sections of the District of Columbia Code: §§ 22–1107, 1121. The specific provision pertaining to the failure to obey a police order to move on is found at § 22–1121(2):

> Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby . . .
>
> (2) congregates with others on a public street and refuses to move on when ordered by the police . . . shall be fined not more than $250 or imprisoned not more than ninety days, or both.

Plaintiffs argue that this statute is too sweeping and too imprecise to pass constitutional muster, citing *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

While *Cox* assuredly is the case upon which this issue must be decided, it does not compel the remedy sought by plaintiffs. The disorderly conduct statute involved in that case was worded almost identically to the one in the District.[61] In declaring the law unconstitutional, the Supreme Court noted that although that part of the statute pertaining to the refusal to move on pursuant to an order of a police officer was narrow and specific, the prohibition against congregating "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned" was vague and overly broad. Because this wording could encompass speech and conduct protected by the First Amendment, it was unconstitutional on its face.

■■ The Court has often stated, however, that a limiting construction of an overly broad or vague statute by the courts of proper jurisdiction may save it from the claim that it is unconstitutional. *See, e. g., Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Just such an authoritative interpretation of the disorderly conduct statute has been made by the United States Court of Appeals for this Circuit, narrowing the scope of the law's applicability in a manner which adequately protects First Amendment activities. *Williams v. District of Columbia*, 136 U.S.App.D.C. 56, 419 F.2d 638 (1969).[62] The Court in *Williams* construed the public profanity provision of § 22–1107[63] to apply only to the utterance of

---

61. La.Rev.Stat. § 14:103.1 (Cum.Supp.1962).

62. See also *Von Sleichter v. United States*, 153 U.S.App.D.C. 169, 472 F.2d 1244 (1972).

63. § 22–1107 provides:
It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure; it shall not be lawful for any person or persons to curse, swear, or make use of any profane language or indecent or obscene words, or engage in any disorderly conduct in any street, avenue, alley, road, highway, public park or inclosure, public building, church, or assembly room, or in any other public place, or in any place wherefrom the same may be heard in any street, avenue, alley, road, highway, public park or inclosure, or other building, or in any premises other

obscene or profane language in public which threatens a breach of the peace. The Court then defined the concept of breach of the peace:

> And for these purposes a breach of the peace is threatened either because the language creates a substantial risk of provoking violence, or because it is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance.

While the latter portion relating directly to profane language is not pertinent to the issue at hand,[64] the conclusion that a substantial risk of violence must be present before an utterance may constitute a breach of the peace is directly applicable to this case.

The police may not attempt to regulate the conduct of a demonstration by ordering persons to "move on" unless a breach of the peace is threatened or intended. Further, the standard guiding an officer in deciding whether a breach of the peace has occurred or will occur is the presence of a substantial risk of violence. Although it may be argued that this construction of the law still allows the officer too much latitude and does not define the operative term "violence", the Court believes that this interpretation, when applied to the failure-to-move-on provision, sufficiently narrows and clarifies the prohibitory language to distinguish this case from the issue confronting the Court in *Cox*. The fact that the police apparently did not abide by this restrictive construction poses additional questions which will be discussed later. It is sufficient at this point to conclude that the failure-to-

move-on provision construed in the manner previously explained, may be constitutionally enforced against persons arrested in demonstrations.

**b.** *Unspecified Charges of Disorderly Conduct under §§ 22–1107, 1121*

These two statutes, defining the offense of disorderly conduct, are multifaceted. Various kinds of conduct come under their umbrella. As previously discussed, part of the language employed would be void for vagueness were it not for the incorporation of a limiting interpretation by this Circuit's Court of Appeals. Plaintiffs further argue the proposition that "[u]nspecified charges of disorderly conduct under 22 D.C.Code §§ 1107, 1121 are too vague to serve as the basis of police actions or arrests in demonstration situations." [65]

Individual officers (sometimes under instructions) undoubtedly have failed to state adequately the charges placed against arrestees. The alleged illegality of these actions and possible equitable remedies will be taken up later. However, as with the failure-to-move-on provision, the Court understands the problem to lie in the enforcement of the law, and not in the provisions themselves. The fact that police officers sometimes seem to be unwilling to enforce these laws in a proper manner does not necessitate the conclusion that the law is so poorly drafted as to be incapable of constitutional application.

**c.** *Police Line Ordinance*

The police line ordinance is set forth in Article VI, Section 5(a) of the Police Regulations of the District of Columbia:

> When fires, accidents, wrecks, explosions, parades or other occasions cause

than those where the offense was committed, under a penalty of not more than $250 or imprisonment for not more than ninety days, or both for each and every such offense.

64. This holding does preclude, however, the practice often engaged in by police of arresting persons who were shouting obscenities during a demonstration (for example, at

the Three Sisters Bridge demonstration). A number of arrests predicated solely on the profanity of the arrestee, without a showing of a likelihood of inciting violence, were clearly without probable cause and unlawful under *Williams*.

65. Plaintiffs' proposed conclusion of law # 6.

or may cause persons to collect on the public streets the Chief of Police or officer acting for him may establish such area or zone as he considers necessary for the purpose of affording a clearing for: (1) the operation as firemen or policemen; (2) the passage of a parade; (3) the movement of traffic; (4) the exclusion of the public from the vicinity of a riot or disorderly gathering, accident, wreck, explosion or other emergency, and (5) the protection of persons and property. Every person present at the scene of such an occasion shall comply with any necessary order or instruction of any police officer. No person shall enter such area or zone, unless duly authorized by the person in command on such an occasion: Provided, that bona fide representatives of the press and bona fide insurance adjusters or underwriters and such other persons as the Chief of Police may authorize to be within such space and who shall have plainly exposed to view the press pass or the pass described in this section shall be permitted within the lines established by the Police Department . . .

The scope of the ordinance is expansive, to say the least. Limits on police discretion are virtually nonexistent. Unlike the portions of the disorderly conduct statute discussed above, the breadth of this ordinance is not limited by judicial or regulatory construction.[66]

A few examples of the vagueness inherent in the ordinance should be cited. The instigating events which may trigger the creation of a police line include, in addition to the easily recognizable disasters (fire, explosion, etc.), "other occasions [which] cause or may cause persons to collect on the public streets." No distinction is made between public gatherings which are related to first amendment activities and those which are not. One of the purposes for which the police line may be erected is the protection of persons and property. However, neither the ordinance nor accompanying guidelines outline the kinds of dangerous conditions which might warrant this sort of intervention. Again, the proper course of conduct may be easily apprehended when a fire occurs, but is less well defined when a demonstration takes place. An officer may conclude that demonstrators are using language offensive to bystanders and that a police line is a proper preventive measure, as was done in the Three Sisters bridge demonstration. There are no instructions to officers that the overreaction of bystanders to the conduct or words of demonstrators may not be the basis for initiating a police line. *See Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S. Ct. 900, 84 L.Ed. 1213 (1940).[67]

Perhaps the most open-ended provision of the ordinance states that "[e]very person present at the scene of such an occasion shall comply with any necessary order or instruction of any police officer." Anyone who disobeys such an order is presumably subject to arrest. It is difficult to conceive of a more pernicious proscription. A police officer is given unfettered discretion to issue any order he thinks reasonable and then is allowed to initiate criminal proceedings against a person who disobeys the order. Justice Black perceived this evil in his concurrence in *Gregory v. Chicago,* 394

---

66. Chief Wilson confirmed in his testimony that the department had no written guidelines pertaining to the maintenance of police lines and had no plans to issue any. Testimony of Jerry Wilson, April 8, 1974, Tr. 131.

67. Of course, so-called "fighting words" may be so provocative of violence as to allow official intervention, but this nuance of constitutional law is not reflected in the ordinance. *See Feiner v. New York,* 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

U.S. 111, 113, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969):

> To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws.[68]

The serious due process flaw in such an arrangement is further compounded when the law enforcement officer's discretion is exercised in the context of constitutionally protected First Amendment activities.[69]

Nor may defendants assert the pretense that this is merely a regulation as to time and place. The mechanics of establishing a police line (e. g., the geographic area to be encompassed, the number of officers deployed, means of maintaining the line against assault, the duration of time which the line is to be maintained, how to announce to the public the initiation of a line) are conspicuously absent from the police regulations. Clearly the police department must have some flexibility in its choice of techniques to carry out its lawful duties. This virtually axiomatic proposition can be neither a defense nor excuse, however, for the kind of limitless arrogation of power embodied in the police line ordinance.

 The record in this case is replete with instances of police excesses and interference with lawful demonstration activities arising out of the decision to deploy a police line and/or to order a sweep. With only verbal orders to guide them, police officers cannot hope to satisfy the restrictive demands imposed on the government before it may regulate conduct which incorporates elements of speech protected by the First Amendment. For this reason, the Court concludes that the police line ordinance, as

applied to demonstration activities (i. e., those in which First Amendment rights are being asserted), is unconstitutionally vague and overly broad. Until the police department or the District of Columbia government specifies the scope and limits of the department's power to clear a public area, sufficient to inform both the police and the public of their responsibilities, it must be enjoined from erecting police lines and initiating sweeps of areas during demonstrations.

### Constitutionality of Police Conduct

#### 1. Crowd Control

 Peaceful demonstrations carried on in a location generally open to the public are entitled to the protection of the First Amendment. *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). Because they possess both speech and non-speech elements, demonstrations are subject to reasonable regulations which limit the time, place or scope of the activities (e. g., traffic laws). *See Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1968); *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). However, the mere fact that conduct is an element of a demonstration is not justification for proscribing the entire event. *Logan Valley Plaza, supra.*

 Whenever the government seeks to regulate activity which combines speech protected by the first amendment with other forms of conduct, it must employ the least restrictive means available to accomplish its limited objective. The Supreme Court in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) devised the follow-

---

68. 394 U.S. at 120, 89 S.Ct. at 951.

69. *See Cox v. Louisiana*, 379 U.S. 557–58, 85 S.Ct. at 466: "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."

ing test for determining the legality of this type of government regulation:

> Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[70]

 The police department's practices during the demonstrations of 1969–1971 failed to satisfy this standard. Perhaps the most easily identifiable deficiencies were the improper use of police lines and sweeps, and invocation of the failure-to-move-on statute in a manner which maximized the chance of arresting persons who were innocent of any wrongdoing. The large percentage of arrestees whose charges were dropped lends credence to plaintiffs' claims that a significant number of persons were arrested without probable cause. Such arrests were manifestly violative of the Fourth Amendment.[71] Furthermore, the decision in the Watergate and May Day demonstrations to suspend use of the field arrest forms and the failure to otherwise record information necessary for prosecution resulted in arrests which were presumptively invalid because of the inability to establish probable cause. *Sullivan v. Murphy, supra.*

 Even when there was probable cause for arrests, the means used were often unjustified. The use of physical force in excess of that required to effectuate an arrest or to carry out other lawful duties was a deprivation of the constitutional rights to due process of law and to be secure against unreasonable searches and seizures. *Carter v. Carlson,* 144 U.S.App.D:C. 388, 447 F.2d 358 (1971), *rev'd on other grounds,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *see also Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). The characterization "physical force" includes not only the beatings inflicted, but also overly enthusiastic use of the riot baton and chemical agents.[72]

 In most demonstrations, neither the officers in the field nor their supervisors made sufficient efforts to minimize the interference with constitutional rights. On the contrary, they consistently overreacted and overstepped the bounds of their constitutional powers. These actions did not meet the standards of *Cox, Logan Valley* and *O'Brien.*

### 2. Post-Arrest Procedures

Because of the large number of arrests made in these demonstrations, difficulties arose in the processing of arrestees which the department would not normally face. Certainly the depart-

---

70. 391 U.S. at 377, 88 S.Ct. at 1679.

71. Even if the arresting officers had acted in good faith, they would not be saved from potential liability for the constitutional deprivations. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

 In *Pierson,* the Court created a defense to an action under § 1982 for unlawful arrest that an officer is not liable if he "reasonably believed in good faith that the arrest was constitutional . . . ." Some disagreement has developed whether a "reasonable belief" should be determined as a subjective element of the defense or viewed as an objective determination of probable cause. *Compare Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d

1339 (2d Cir. 1972); *Brubaker v. King,* 505 F.2d 534 (7th Cir. 1974) *with Joseph v. Rowlen,* 402 F.2d 367 (7th Cir. 1968); *Boscarino v. Nelson,* 377 F.Supp. 1308 (E.D. Wis.1974). Whichever interpretation is accepted, it is clear that the mere assertion of good faith by an arresting officer does not obviate the need to also prove the reasonableness of his belief that his actions were constitutional. *See also Whirl v. Kern,* 407 F.2d 781 (5th Cir. 1969).

72. There is, of course, a wide variety of police actions which, in a given time and place, may be mistreatment of a constitutional dimension. *See, e. g., Anderson v. Nosser,* 456 F.2d 835 (5th Cir. 1972) *(en banc).*

ment must have administrative flexibility in order to account for the exigencies of a given situation. Nevertheless, due process requires that certain minimum standards be observed when a person is taken into custody.

The most egregious failings during the arrest and booking process, perhaps because there could be no reasonable excuses, were the refusal to advise arrestees of the specific charges being made against them and to give them their *Miranda* warnings. This misfeasance was a denial of due process. *Feeley v. District of Columbia,* 128 U.S. App.D.C. 258, 387 F.2d 216 (1967). As the Court of Appeals stated in the latter case:

> We think that when the participants were arrested and prosecuted they were entitled to know with some precision what law they had allegedly violated. Perhaps this is miniscule, but, when the Congress enacts laws describing criminal offenses in intricate patterns and with apparent variations in details, we think enforcement officers must be correspondingly exact.[73]

Plaintiffs also argue that the booking process was overly long, entailing unreasonable delays in release. This claim is centered about the fact that many persons were prevented from obtaining their immediate release by posting collateral. Section 23–1110(b) of the D.C.Code allows a properly designated officer of the police department to issue a citation and to release from custody a person who has been arrested without a warrant on a misdemeanor charge. Although the statute is phrased in discretionary terms, the Court of Appeals has held that the police are required to advise a person arrested for a minor offense of the option of posting collateral and to give him the opportunity of exercising that option. *United States v. Mills,* 153 U.S.App.D.C. 156, 472 F.2d 1231 (1972).[74] This right to post collateral should be read in conjunction with the requirement that a person arrested with or without a warrant be taken before a court or magistrate "without unnecessary delay." Rule 5, Federal Rules of Criminal Procedure; D.C.Code § 23–562(c)(1). *See also Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957). After the decision in *Mills,* it must be presumed that the booking and collateral release of a detainee should proceed without any unnecessary delays.[75]

Whether law enforcement officials have moved with reasonable promptness must be examined on an *ad hoc* basis.[76] The mere fact that detainees spent hours in detention, often in inconvenient circumstances, before being processed and released does not itself compel the conclusion that the police were unnecessarily dilatory. For this reason, plaintiffs' request that the department adhere to a two hour time limit on collateral release is unreasonable and unsupportable. *Cf.* 18 U.S.C. § 3501.

There is sufficient evidence, however, that the department followed procedures, or failed to adopt policies, which had the effect of unreasonably delaying the booking process and the opportunity for collateral release. Foremost was the practice of asking numerous personal questions which were irrelevant to the booking process. Many people were not allowed to post collater-

---

73. 387 F.2d at 219–20.

74. This principle was reaffirmed in *United States v. Robinson,* 153 U.S.App.D.C. 114, 471 F.2d 1082 (1972), *rev'd on other grounds,* 414 U.S. 218, 94 S.Ct. 467, 38 L. Ed.2d 427 (1973). Defendants amendments to the Prisoner Control Handbook, promulgated September 1, 1972, recognized the obligations imposed by *Mills.* Def. Ex. I–1.

75. *See also* D.C.Code § 23–562(c)(2), which requires that booking of arrestees be carried out with "reasonable promptness."

76. *See Gray v. United States,* 394 F.2d 96 (9th Cir. 1967); *Butterwood v. United States,* 365 F.2d 380 (10th Cir. 1966), *cert. denied,* 386 U.S. 937, 87 S.Ct. 960, 17 L.Ed.2d 810.

al, even if available, until such questions were answered. Some persons who were ready to post collateral after completing all questioning were still required to wait hours before release.[77] Others who did not have sufficient money in their possession were not allowed to make telephone calls to persons outside who could obtain the money.[78] Finally, some question remains whether the department might not have made better preparations for these demonstrations so that sufficient personnel and adequate facilities could have been available. Whether the department purposely failed to make such plans in order to prolong the booking process, thereby keeping the demonstrators off the streets, cannot be conclusively determined from the record. Whatever the motivation, however, the net effect of keeping persons in detention for such extraordinarily long periods of time was unlawful.[79]

### 3. *Medical Care/Fingerprinting*

 Although the courts are loath to second-guess the judgment of medical authorities, there are instances when the level of medical care provided by public authorities is so grossly inadequate as to give rise to claims of cruel and unusual or summary punishment. *See, e. g., Thomas v. Pate*, 493 F.2d 151 (7th Cir. 1974). There is ample evidence in this record of examples of inadequate attention to the medical needs of persons in the custody of the police. In some cases the injuries were so severe that gross neglect by responsible offi-

cers, at the time of arrest and at the detention facility, amounted to deprivations of constitutional rights.

 Plaintiffs also contest the practice of photographing and fingerprinting arrestees who are not residents of the District. No cases have been cited in support of the proposition that this practice is a deprivation of constitutional rights. The Court finds that there is a rational basis for the policy and concludes that it does not entail a denial of due process or equal protection. However, both the photographs and fingerprints may be included in those documents which should be expunged pursuant to the ruling, *infra,* pertaining to the expungement of arrest records.

### *Injunctive Relief*

At the outset of the discussion of the facts of this case, the Court summarily stated the burden of proof placed on plaintiffs to justify injunctive relief. It is appropriate at this juncture to reiterate the guidelines which the Court understands it must follow before it may invoke its equitable powers. Plaintiffs must prove:

1. That officers of the police department have engaged in a pattern of conduct which violates constitutional rights;
2. That this conduct has been repeated over a period of time and is likely to return if ameliorative steps are not taken;
3. That the unconstitutional conduct is the direct result of the depart-

---

77. This may have been part of a decision to defer taking collateral until all persons had been booked. This decision would have been tolerable if the booking process itself had not been prolonged needlessly.

78. The Court finds that defendants' policy of not allowing attorneys or representatives of organizations to post collateral for detainees who they could not identify in advance was, in this context, an unnecessary delay in effectuating the release of many of the arrestees. However, there is no support for plaintiffs' contention that a person has a right to counsel at the time of booking or collateral release. These are not interroga-

tive stages of the criminal process, but merely administrative prerequisites. *Cf.* Rule 44(a), Federal Rules of Criminal Procedure.

79. Plaintiffs also cite such conditions as overcrowded cells and inadequate sanitary facilities as examples of constitutional abuse. Although these problems might have been obviated by better planning, they do not appear to be of sufficient gravity to be deemed deprivations of constitutional rights. *Cf. Anderson v. Nosser*, 438 F.2d 183 (5th Cir. 1971), *modified en banc*, 456 F.2d 835 (5th Cir. 1972).

ment's policies and procedures or has been allowed to occur because of the lack of supervision and training by defendants;

4. That defendants have failed to take adequate steps to correct the misconduct.

*Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Washington Free Community, Inc. v. Wilson*, 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973); *Long v. District of Columbia*, 152 U.S.App.D.C. 187, 469 F.2d 927 (1972); *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966). See also *Carter v. Carlson*, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), *rev'd on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

In deciding whether to exercise its equitable jurisdiction, the Court is mindful of the problems inherent in any interference by the Court in the internal operations of the police department. Viewing the difficulties in a purely practical light, such relief should be avoided if the department itself is taking steps to rectify the deficiencies. *Washington Free Community, Inc. v. Wilson, supra.* However, the Court must also consider the symbiotic relationship existing between the police department in the District of Columbia and the courts. Efficient execution of the judicial process in criminal cases requires the effective cooperation of various law enforcement agencies. If the police department systematically fails to carry out its proper functions, it is a matter of direct concern to this Court.[80]

The Supreme Court long ago recognized not only the federal judiciary's obligation to insure due process of law, but also "the duty of establishing and maintaining civilized standards of

procedure and evidence" as part of its "[j]udicial supervision of the administration of criminal justice . . . ." *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). This supervisory authority may reach into the operations of a law enforcement agency which directly affect the viability of criminal prosecutions. In *McNabb*, evidence was excluded and a conviction reversed as a result of improper police interrogation techniques. Although the Court was not confronted with the issue of injunctive relief, the decision in *McNabb* does establish the principle that when federal law enforcement officials engage in conduct which directly affects the judiciary's role within the criminal process, the Court has the power, pursuant to its supervisory authority, to establish standards of conduct which will insure the orderly administration of justice.

In fashioning this relief, the Court hopes to give as much leeway as possible to the department in devising those procedures and policies which will best eradicate the problems discussed. There are two practices, however, which the Court feels should cease immediately: arrests pursuant to the police line ordinance and arrests made without field arrest forms (or other means of recording essential information). The first issue was discussed previously. The police line ordinance is unconstitutional as applied to demonstrations in which first amendment rights are being exercised. The police must be restrained from invoking it as a basis for arrest in this context.

The use of field arrest procedures is a more difficult issue. It goes directly to the question of the Court's power to affect the internal decisions of the department. The police concededly

---

80. It is this fact which makes inapplicable defendants' argument that *Gilligan v. Rhodes*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed. 2d 407 (1973) is controlling. In that case, suit for injunctive relief was brought against the Ohio National Guard. The Court concluded that the case did not present a justiciable controversy because control of mili-

tary operations is committed exclusively by the constitution to the executive and legislative branches of government. Although there may be some similarity between the problems of interfering in the internal operations of the police and the military, the constitutional difficulties of *Gilligan* are not present in this litigation.

face an exceptionally difficult task when numerous arrests are made. Extraordinary responses by the department must be considered. Crucial decisions must be made in the heat of confrontation. The Court is sensitive to the charge that it is second-guessing the department in an area which is perhaps too fluid to be controlled by the relatively slow-moving judicial mechanism. Nevertheless, the *Sullivan* and *McNabb* cases certainly authorize, if not obligate, this Court to order the cessation of constitutional violations or gross improprieties by police which seriously hinder the administration of criminal justice. The defendants have failed to take the initiative. To the contrary, Chief Wilson testified that the abandonment of field arrest forms might again become feasible and desirable in mass demonstrations. Defendants have put nothing in the record to counter this assertion. The police may not simply claim exasperation at the enormity of the task and defer constitutional precepts to convenience. Therefore, defendants must be enjoined from instituting mass arrests without the contemporaneous completion of field arrest forms or some other administrative device for recording information necessary to establish probable cause.

### Affirmative Relief

▇▇▇ In addition to enjoining certain practices, the police department's inertia requires the Court to impose affirmative sanctions. This relief is neither unusual nor unwarranted. *Lewis v. Kugler,* 446 F.2d 1343 (3d Cir. 1971); *Council of Organizations on Philadelphia Police Accountability and Responsibility (COPPAR) v. Rizzo,* 357 F.Supp. 1289 (E.D. Pa.1973), *aff'd sub nom. Goode v. Rizzo,* 506 F.2d 542 (3d Cir. 1974).

The Court will not endeavor at this point to order specific changes in police procedures. Nor will the Court take upon itself the task of rewriting the department's Orders or manuals. Instead, the course followed in the *COPPAR* case seems to be the most practical one. Defendants will be required to formulate a comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the department in mass demonstrations. The duties of officers assigned to the CDU and PCC should be clearly delineated. This plan should include instructions in all of those problem areas identified in the Findings of Fact. Some of the material comprising such a plan has already been adopted by the department, either by verbal or written order. Defendants' task will be put to these matters in written form and compiled in an orderly and understandable fashion. Other policies will have to be devised or rewritten. Defendants will be directed to file the comprehensive plan and statement of policy and procedures in this Court and serve a copy thereof upon counsel for plaintiffs within 90 days of the date of judgment in this case.

### Expungement of Arrest Records

▇▇▇ This Court has the power to order the expungement of records maintained incident to arrest (including photographs and fingerprints) for which probable cause did not exist or could not be shown. *Menard v. Saxbe,* 162 U.S. App.D.C. 284, 498 F.2d 1017 (1974). Declaratory relief to this effect—that records of arrests made in the demonstrations discussed in this opinion which were not supported by probable cause may not be maintained by the police department—is proper and will be so ordered. Injunctive relief, however, must be approached on a case by case basis. The record in this action is incomplete on the issues of which records are still retained by the department and whether expungement, or some other means of vitiating the adverse consequences of the arrests, should be ordered. Class-wide injunctive relief would be inappropriate on the basis of this record. Persons arrested should present requests for expungement of their records to the police department, which will hopefully comply in good faith with the holdings in *Menard* and *Sullivan,* and this case, without

further action by the aggrieved persons.[81]

Counsel for the plaintiffs will present a form of judgment in accordance with this Memorandum Opinion.

## JUDGMENT

This action came on for trial before the Court sitting without a jury and upon consideration of the testimony, the affidavits and exhibits, and the entire record herein, the Court having concluded that plaintiffs are entitled to judgment in this action, in accordance with the Memorandum Opinion including Findings of Fact and Conclusions of Law filed herein on July 28, 1975, it is by the Court this 26th day of August, 1975,

Declared, ordered and adjudged:

1. That this action be, and the same hereby is, certified as a class action consisting of all persons who have participated in or observed and who intend to participate in or observe lawful, peaceful, orderly and non-obstructive public demonstrations for the exercise of their Constitutional rights of free speech and assembly;

2. That the Police Line Ordinance, Article VI, Section 5(a) of the Police Regulations of the District of Columbia be, and the same hereby is, declared unconstitutional as applied to demonstration activities in which First Amendment rights are being asserted in that said ordinance is vague and overly broad.

3. That defendants, their agents, successors, and assigns, and all those having actual notice of this Judgment be, and the same hereby are, enjoined from erecting police lines and initiating sweeps of areas during demonstrations pursuant to Police Line Ordinance, Article VI, Section 5(a) of the Police Regu-

lations of the District of Columbia unless and until the police department or the government of the District of Columbia specifies the scope and limits of the department's power to clear public areas, sufficient to inform both the police and the public of their responsibilities.

4. That defendants, their agents, successors and assigns, and all those having actual notice of this judgment be, and they thereby are enjoined from attempting to regulate the conduct of persons exercising their First Amendment rights by ordering them to "move on" unless a breach of the peace involving a substantial risk of violence has occurred or will occur.

5. That defendants, their agents, successors, and assigns, and all those having actual notice of this Judgment be, and the same hereby are, enjoined from instituting mass arrests without the contemporaneous completion of field arrest forms or other administrative device or procedure for recording information necessary to establish probable cause for the arrest.

6. That all records of arrests of members of the class specified in paragraph 1 hereof during the demonstrations occurring on November 14, 1969, November 16, 1969, February 19, 1970, February 21, 1970, October 2, 1970, May 5–11, 1970, and the so-called May Day Demonstrations of 1971, as to whom the defendants and/or their predecessors failed to follow normal booking procedures and lack a contemporary field arrest form, photograph, or other evidence of probable cause for arrest, and as to whom, irrespective of alleged contemporaneous field arrest forms and photographs, the defendants failed to establish probable cause for the arrest, may not be maintained by the defendants and

---

81. The department should not continue to assert that they are barred by statute from expunging arrest records and that amplification is the sole remedy available to plaintiffs. See D.C.Code § 4–137; *Spock v. District of Columbia*, 283 A.2d 14 (D.C.Ct.App.

1971). The Court in *Sullivan* rejected this argument and held that a federal district court has the power to fashion a proper equitable remedy (including expungement) whenever constitutional rights have been violated.

all such seizures shall be deemed to have been "detentions" rather than "arrests".

7. That members of the class whose arrest records are invalid pursuant to paragraph 6 of this Order are entitled, upon request to defendants, to expungement of all such records, and recall for destruction of all such records and all copies thereof from all persons or agencies to which they have been disseminated.

8. That defendants be, and the same hereby are, ordered to formulate a comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the police department in mass demonstration situations and that such written plan be filed with this Court within ninety (90) days from the date of this Judgment, a copy of such plan to be served upon counsel for plaintiffs.

9. That judgment herein be, and the same hereby is, entered for plaintiffs in accordance with the preceding paragraphs; and

10. That plaintiffs recover of defendants their taxable costs.